# United States Tax Court

T.C. Memo. 2022-105

CLARK RAYMOND & COMPANY PLLC, D. EDSON CLARK, CPA,
PLLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 2265-19.                              Filed October 13, 2022.

————

CRC, an accounting firm, is a partnership subject to the TEFRA provisions of I.R.C. §§ 6221–6234. Three single-member entities—C, N, and T—were partners of CRC in 2013 and negotiated a buyout of C in anticipation of the retirement of C's principal owner, which they memorialized in a restated partnership agreement. The partnership agreement also included provisions governing allocations of income and distributions (both liquidating and non-liquidating) to the partners, and it included a qualified income offset (QIO) provision. The partnership agreement anticipated that a partner could receive a distribution of "clients" from the partnership and provided a method for valuing such a distribution.

Shortly after executing the restated partnership agreement, N and T withdrew from CRC, and certain clients of CRC stopped engaging CRC and instead retained N's and T's new partnership (NT PLLC). C, as tax matters partner for CRC, reported on CRC's 2013 Form 1065, "U.S. Return of Partnership Income", that N and T received distributions from CRC in amounts equal to the value of the clients (as determined under the restated partnership agreement) that followed N and T to NT PLLC. C also decreased N's and T's capital accounts by the value of the

reported distributions, and thereby reduced N's and T's capital accounts below zero. To restore N's and T's capital accounts to zero, C allocated (for tax purposes) all of CRC's ordinary income for 2013 to N and T, pursuant to a QIO provision in the partnership agreement, and so reported on CRC's tax return. As a result, C allocated to itself no taxable income from CRC.

N and T filed Forms 8082, "Notice of Inconsistent Treatment or Administrative Adjustment Request (AAR)", contesting CRC's 2013 income allocations, and R subsequently audited CRC's 2013 return. R issued a Letter 1830–F, "Notice of Final Partnership Administrative Adjustment" (FPAA), disregarding CRC's reported "client distributions" and redetermining allocations of ordinary income to N and T. Specifically, R determined that CRC's "client distributions" had not been substantiated and that CRC's corresponding allocations of income lacked substantial economic effect.

C, as TMP of CRC, timely filed a Petition in this Court contesting R's determinations in the FPAA. The parties filed a joint motion to submit this case pursuant to Rule 122, which we granted.

*Held*: CRC distributed client-based intangible assets to N and T when they withdrew from CRC, and the value of the assets so distributed are properly valued under the terms of CRC's partnership agreement.

*Held, further*, CRC failed to maintain capital accounts in accordance with Treas. Reg. § 1.704-1(b)(2)(iv); therefore, CRC's special allocations of income to N and T lacked substantial economic effect and must be reallocated in accordance with the partners' interests in the partnership under I.R.C. § 704(b) and Treas. Reg. § 1.704-1(b)(3).

*Held, further*, because N and T had negative capital accounts at the end of the taxable year and CRC's partnership agreement included a QIO, ordinary income must be allocated first to N and T in an amount necessary to bring each partner's capital account up to zero.

[*3]      *Held, further*, R's determinations disregarding CRC's "client distributions" and redetermining allocations of ordinary income are not sustained.

———————

*Sandra Veliz*, for petitioner.

*Amy Chang* and *Gregory M. Hahn*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, *Judge*:   On December 17, 2018, the Internal Revenue Service ("IRS") issued a notice of final partnership administrative adjustment ("FPAA") for the taxable year ending December 31, 2013, to D. Edson Clark, CPA, PLLC ("Clark PLLC"), the tax matters partner ("TMP") for Clark Raymond & Co., PLLC ("CRC"). This case is a partnership-level action under the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"),[1] *see* § 6221,[2] based on a Petition filed by the TMP pursuant to section 6226.  After concessions by the parties,[3] the remaining issues for decision are: (1) whether CRC made

———————

[1] TEFRA, Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, codified at sections 6221 through 6234, was repealed for returns filed for partnership tax years beginning after December 31, 2017.

[2] Unless otherwise indicated, statutory references in this opinion are to the Internal Revenue Code ("the Code", Title 26 of the United States Code) as in effect at the relevant times; references to regulations are to Title 26 of the Code of Federal Regulations ("Treas. Reg.") as in effect at the relevant times; and references to Rules are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded.  Each citation in this Opinion to a "Doc." refers to a document so numbered in the Tax Court docket record of this case, and a pinpoint citation therein refers to the pagination as generated in the portable document format file.

[3] In stipulations of settled issues (Docs. 18, 28, and 32), the parties have stipulated that for the 2013 tax year: (1) CRC's "other income" was −$322,639; (2) CRC made guaranteed payments in the total amount of $62,000 (comprising $7,200 to Clark PLLC, $2,400 to Chris Newman CPA, PLLC ("Newman PLLC"), $2,400 to John E. Town, CPA, Inc., P.S. ("Town PS"), and $50,000 to Tony H. Chang, CPA, PLLC, an entity that would become a partner of CRC after the events at issue); (3) CRC's reported "other deductions" should be increased to $596,818; (4) CRC's reported ordinary business income should be increased to $563,118; (5) CRC made distributions of cash and marketable securities in the total amount of $657,201 (comprising $632,201 to Clark PLLC, $20,000 to Newman PLLC, and $5,000 to Town PS); (6) CRC

[*4] distributions of client-based intangible assets to its partners during 2013; and (2) whether CRC's ordinary income allocations reported on its Form 1065, "U.S. Return of Partnership Income", had substantial economic effect under section 704(b). The parties jointly filed stipulations of fact and moved to submit this case under Rule 122 for consideration without trial. For the reasons detailed below, we will not sustain the IRS's determinations.

## FINDINGS OF FACT

The facts below are based on the pleadings and the parties' stipulations of fact (including the exhibits attached thereto).

I.    *CRC's business activity*

CRC is a professional limited liability company formed under the laws of the State of Washington. When it filed its Petition, CRC's principal place of business was Redmond, Washington.[4]

CRC provides accounting, tax planning and preparation, and related professional services to its clients. Because it is a service-based organization, its tangible assets consist solely of office equipment and supplies, office furniture, cash, accounts receivable, and works-in-process.

CRC is generally a successful business and services many clients. Before performing services for a client, CRC and the client enter into an engagement agreement specifying the scope of CRC's services and fees. The engagement between CRC and a client is terminable at will by either CRC or its client.

Generally, a certified public accountancy firm ("CPA firm") such as CRC may not require a client to continue to retain its services if the client decides to terminate the business relationship, and a client may not require a CPA firm to continue providing services if the CPA firm decides to terminate the business relationship. Neither the CPA firm nor its clients (or former clients) may require the other to sign a new

---

is not liable for the accuracy-related penalty under section 6662(a); and (7) CRC made a property distribution with a fair market value of $183,737 to Newman PLLC, with respect to a loan from the Washington Trust Bank.

[4] Absent stipulation otherwise, venue for an appeal in this case would be in the U.S. Court of Appeals for the Ninth Circuit. *See* § 7482(b).

[*5] engagement agreement or renew a terminated engagement agreement.

If an accountant leaves his current CPA firm for a new firm, clients of the current firm may choose to terminate their relationship with the current firm and begin a relationship with the new firm. In such an instance, the client "follows" the accountant to his new firm; and the accountant, the prior firm, and the client will generally agree upon procedures to facilitate the transfer of the client's files from the prior firm to the new firm. The clients who follow an accountant to a new firm, and who may generate future cash flow from payments made to the new firm, are generally referred to as that accountant's "book of business".

## II. *Partner-entities in CRC*

D. Edson Clark formed CRC in 2006. Since its formation, various entities have joined and withdrawn from CRC as partners.[5] The following entities were partners of CRC during the relevant years:[6]

### A. *Clark PLLC*

Clark PLLC is a professional limited liability company organized under the laws of the State of Washington. Clark PLLC was a partner of CRC for the taxable years ending December 31, 2011, 2012, and 2013.

Mr. Clark and his wife, Barbara Clark, have been the sole shareholders of Clark PLLC, and therefore Mr. Clark held a partnership interest in CRC indirectly through Clark PLLC for the relevant years. CRC employed Mr. Clark as an accountant and Mrs. Clark as firm administrator during the relevant years.

---

[5] CRC filed as a partnership for federal income tax purposes during the year at issue. *See* Treas. Reg. § 301.7701-3(b)(1). Although CRC's partnership agreements refer to Clark PLLC, Newman PLLC, and Town PS as "members" (and each, a "member"), we refer to each of them as "partners" of CRC; and we generally refer to the members of LLCs as "partners". *See* § 761(b) ("the term 'partner' means a member of a partnership").

[6] Our reference to the "relevant years" means the tax years 2011, 2012, and 2013. Although only the income allocations from the 2013 tax year are at issue, we discuss partnership operations in the prior years to provide context to the partners' agreements and prior handling of client distributions upon withdrawal of a partner.

[*6]  B.  *Benbow PS*

Rachelle A. Benbow, PS ("Benbow PS"), is a professional services corporation incorporated under the laws of the State of Washington by Rachelle A. Benbow, who became a CRC employee in 1999.

Benbow PS purchased a 25% partnership interest in CRC from Clark PLLC for approximately $580,000 in 2006 and was admitted to CRC as a partner.  The purchase was seller-financed by Clark PLLC, with Benbow PS obtaining a loan from Clark PLLC for the purchase price.  The purchase price was calculated by totaling CRC's prior 12 months of gross receipts (intended to reflect the total value of CRC's "book of business") and the net value of CRC's tangible assets.  The agreement between Benbow PS and Clark PLLC reflected that Benbow PS purchased an indirect interest in 25% of CRC's tangible assets and 25% of CRC's "book of business" when it purchased a 25% partnership interest in CRC.  CRC credited Benbow PS's capital account with an initial balance of $580,000.

CRC employed Ms. Benbow as an accountant from 1999 until October 2011, at which time Benbow PS ceased being a partner of CRC.

C.  *Town PS*

John E. Town, CPA, Inc., P.S. ("Town PS"), is a professional services corporation incorporated under the laws of the State of Washington by John E. Town, who became a CRC employee in 2007. Town PS did not make a direct capital contribution to CRC but instead purchased a 25% partnership interest from Clark PLLC in 2009 and was admitted to CRC as a partner on January 1, 2009.

The purchase was seller-financed by Clark PLLC, and Town PS obtained a loan from Clark PLLC for the entire purchase price.[7]  Clark PLLC and Town PS calculated the purchase price for Town PS's 25% partnership interest by first summing the values of CRC's tangible

---

[7] Though the parties stipulate the fact of the loan, Town PS did not execute a promissory note to evidence the loan from Clark PLLC.  It is unclear whether Town PS made payments on the loan to Clark PLLC in 2009 or in 2010, because Clark PLLC reported on its 2009 and 2010 Forms 1120S, "U.S. Income Tax Return for an S Corporation", that it received no payments.  However, Clark PLLC reported that the outstanding principal balance of the loan decreased to $606,288 in 2009 and to $570,347 at the end of 2010.  In 2011 Town PS made a payment of $11,371 on the balance of the loan to Clark PLLC, but it did not make any further payments after 2011.

**[*7]** assets, accounts receivable, and works-in-process, and then subtracting the total value of CRC's liabilities to produce an agreed-upon total net value of CRC of $3,491,985. They then multiplied this value by 25% to calculate the value of a 25% partnership interest in CRC, viz., $872,996. However, before his employment at CRC, Mr. Town had developed professional client relationships, and those clients decided to retain CRC when Mr. Town became a CRC employee in 2007. Clark PLLC and Town PS discounted the price to be paid for the 25% partnership interest in CRC by the amount of revenue generated by Mr. Town's "book of business" in the prior year.[8] This discount reduced the purchase price of $872,996 by $234,046, for a final purchase price of about $639,000. CRC set Town PS's initial capital account balance at $639,000, the amount of the agreed-upon purchase price (and did not adjust the balance upward to reflect the value of the book of business).

CRC employed Mr. Town as an accountant from 2007 until May 1, 2013, at which time Town PS ceased being a partner in CRC.

D.     *Chris Newman CPA, PLLC*

Chris Newman CPA, PLLC ("Newman PLLC"), is a professional limited liability company organized under the laws of the State of Washington by Chris Newman, who became an employee of CRC in 2009. Newman PLLC became a partner of CRC in December 2012 and remained a partner until May 1, 2013.

On December 22, 2012, Newman PLLC made a $200,000 cash contribution to CRC using funds it obtained from a loan from Washington Trust Bank (the "WTB Loan"). To obtain the loan, Newman PLLC executed a promissory note in favor of Washington Trust Bank. Mr. Newman, Mr. Clark, and Mrs. Clark each executed personal guaranties with respect to the WTB Loan promissory note. CRC set Newman PLLC's initial capital account balance at $200,000.

---

[8] A detailed description of the purchase price calculation appears in the record. A note next to the "book of business" discount reads: "Agreed upon value of John's book brought in".

**[\*8]**　CRC employed Mr. Newman as an accountant from 2009 until May 1, 2013, at which time Newman PLLC ceased being a partner in CRC.[9]

III.　*CRC's LLC agreement and restatement*

CRC's operating agreement (which it refers to as a "limited liability company agreement") that was applicable during the year at issue was preceded by a prior version and by transactions that form the context for construing the operating agreement.

A.　*2009 LLC agreement*

Effective January 1, 2009, through December 30, 2011, a limited liability company agreement (the "2009 LLC Agreement", Ex. 9–J (Doc. 33, at 247)) governed CRC's operation. The 2009 LLC Agreement stipulated the partners' agreement on the allocation of profits and losses among partners, distributions of cash and property to partners, capital account maintenance, partner withdrawal, and liquidation of the company.

Regarding partner withdrawal, Section 11.1 of the 2009 LLC Agreement provided:

> In the event of a Withdrawal Event, the Withdrawing Member [i.e., Partner] shall first have an option to receive as a Distribution in full consideration of all of the Units of the Member the following:
>
> > (i) Member Clients.　All, or any of, the Clients of the Withdrawing Member . . . and

---

[9] The record does not disclose the number of CRC's members after the withdrawal of Town PS and Newman PLLC on May 1, 2013. If their withdrawal left Clark PLLC as CRC's sole member, a question would arise concerning CRC's status as a partnership. *Cf.* Treas. Reg. § 301.7701-3(f)(2). However, as explained in note 25, *infra*, Tony Chang or an entity he controlled may have been a second continuing member in CRC after the withdrawal of Town PS and Newman PLLC. Because the parties have submitted the case on the premise that CRC was properly classified as a partnership for federal income tax purposes throughout 2013, we have assumed that the withdrawal of Town PS and Newman PLLC did not leave Clark PLLC as CRC's sole member.

**[\*9]**        (ii) Net Book Value.  [The] Withdrawing Member's Percentage Interest of the Net Book Value [of CRC].[10]

Section 8.3(b) of the 2009 LLC Agreement stated that "[i]f any Clients [were] [d]istributed under [the] agreement, the value of such Client [would] be the Client Value", defined (in Section 1.19) as "the gross revenue generated from [each respective] Client over the prior twelve-month period."

In lieu of taking a distribution of clients, a partner could agree to "leave" clients at CRC and apply a portion of the value of those clients to the partner's outstanding loan balance incurred upon its admission (if applicable).

Schedule 1 attached to the 2009 LLC Agreement stated that Mr. Clark owned a 50% partnership interest in CRC, and Ms. Benbow and Mr. Town each owned a 25% partnership interest in CRC.

B.    *2011 negotiations and events preceding the 2012 restatement of the LLC agreement*

In 2011 the partners of CRC were Clark PLLC, Benbow PS, and Town PS.

1.    *Retirement negotiations*

Mr. Clark planned to transfer ownership and management of CRC to the remaining partners in preparation for his retirement.[11] Mr. Clark, Ms. Benbow, Mr. Town, and Mr. Newman discussed a potential buyout of Clark PLLC's partnership interest in CRC, and the implementation of a new partner compensation model using a "Finders,

---

[10] The 2009 LLC Agreement defined "Clients" as "any client[s] of the firm", and "Net Book Value" as "the net book value of the Company, as determined by sound accounting principles . . . [with] marketable securities, real estate, tangible property, and other similar assets . . . valued at fair market value . . . increased by any accounts receivables and works-in-progress . . . and . . . reduced by liabilities associated with the collections of such accounts receivable and works-in-progress."

[11] Accounting firms generally transition ownership either externally, via merger or acquisition, or internally, with a buy-sell agreement between the partners.

**[*10]** Minders, Grinders" ("FMG") system[12] and an "Average Annual Value" ("AAV") system.[13] They also anticipated that the partners would execute non-compete and non-solicitation agreements as part of the proposed buyout of Clark PLLC.

Negotiations of Clark PLLC's prospective buyout reached a stalemate in the last quarter of 2011. At that time Messrs. Clark, Newman, and Town agreed to continue negotiations in 2012, and CRC operated under the terms of the 2009 LLC Agreement for the entire 2011 tax year.

### 2. *Benbow PS's withdrawal as partner*

In October 2011 Ms. Benbow's employment at CRC ended, and Benbow PS ceased to be a partner of CRC. Ms. Benbow began working for another CPA firm, and certain clients formerly engaging CRC decided to retain the services of Ms. Benbow's new CPA firm. Pursuant to this transfer, Ms. Benbow, Benbow PS, and the moving clients executed documents relating to transfer of the client files from CRC to Ms. Benbow.

### 3. *Capital accounts*

Following Benbow PS's withdrawal as partner and the migration of clients to Ms. Benbow's new CPA firm, CRC reported—pursuant to the 2009 LLC Agreement—a property distribution to Benbow PS (and a corresponding capital account decrease) in an amount that reduced its

---

[12] An FMG system calculates wage compensation, profit or loss allocations, and cash distributions to partners by applying metrics and ratios to determine the revenue attributable to the accountant that brought the client to the firm (the finder), the accountant who managed the client and the engagement (the minder), and the accountant who worked the billable hours on the client's engagement (the grinder).

[13] An AAV system computes the amount payable to a departing partner for the value of goodwill that he leaves behind at the firm. A partner's AAV "balance" at departure is the amount payable to the departing partner for his portion of the firm's goodwill. When implementing an AAV system, the partners will agree upon a value of the firm's total goodwill, using the prior 12 months' revenue multiplied by an appropriate factor, and allocate a portion of the total to each partner's AAV balance. A partner's AAV balance may increase or decrease according to the formula employed by the CPA firm to compute the individual partner's contribution to the CPA firm's growth (and presumably, to its goodwill).

[*11] capital account to zero.[14] Benbow PS did not contest the property distribution, but Ms. Benbow disagreed with Mr. Clark regarding the value assigned to CRC's departing clients and the impact to Benbow PS's loan from Clark PLLC. Ultimately, neither Mr. Clark, Clark PLLC, nor CRC requested additional payment from Ms. Benbow or Benbow PS.

C.    *2012 restatement of the 2009 LLC agreement and related events*

In 2012 Clark PLLC, Town PS, and Newman PLLC continued negotiations regarding the buyout of Clark PLLC's interest in CRC. The parties ultimately agreed on buyout terms and memorialized their agreement by executing a "restated" version of the 2009 LLC Agreement on December 24, 2012 (the "2012 LLC Agreement"). The 2012 LLC Agreement as executed did not include a form security agreement to a form promissory note (relating to payments to be made to retiring partners), which the parties continued negotiating and agreed to finalize in January 2013. The 2012 LLC Agreement was effective as of December 31, 2011.

D.    *2013 LLC Agreement*

As planned, the three entity partners of CRC finalized the security agreement and included it when they reaffirmed the terms of the 2012 LLC Agreement on January 18, 2013. (Hereinafter we refer to the reaffirmed 2012 LLC Agreement as the "2013 LLC Agreement", Ex. 11–J (Doc. 33, at 352).) The 2012 terms remained unchanged in the 2013 LLC Agreement, except for minor items that are inconsequential to the outcome of this case. The parties to this case agree that the terms of the 2013 LLC Agreement are operative for this case.

The 2013 LLC Agreement governs many aspects of CRC's operation, including the rights and responsibilities of partners and managers, admission of new partners, and transfer of partnership interests. We discuss below only the provisions relevant to this case.

---

[14] The distribution and capital account adjustment were made pursuant to the 2009 LLC Agreement's provisions regarding distributions of clients, but it is unclear whether Benbow PS received in the distribution any assets other than clients.

**[\*12]**        1.        *Capital account maintenance*

The 2013 LLC Agreement contains sophisticated partnership tax provisions, including rules governing capital contributions and capital account[15] maintenance for each partner.

The 2013 LLC Agreement states that "[a] separate Capital Account will be maintained for each Member throughout the term of the Company in accordance with the rules of Regulation Section 1.704-1(b)(2)(iv)." It states explicitly that each partner's capital account will be increased by the fair market value of contributions (in cash or property), by allocations of "net profit",[16] and by any items of income and gain specially allocated to the partner, and will be decreased by the fair market value of distributions (in cash or property), by allocations of expenditures, and by items of deduction and loss specifically allocated to the partner.

The 2013 LLC Agreement further states that maintenance of capital accounts under the agreement is intended to comply with "the requirements concerning substantial economic performance [sic] under Code Section 704(b)" and that the "[a]greement shall not be construed as creating a deficit restoration obligation or otherwise personally obligating any Member to make a capital contribution".

As part of the buyout negotiations, Clark PLLC, Town PS, and Newman PLLC agreed that, effective December 31, 2011, capital account balances would be as follows: Town PS's capital account balance would be $150,000; Clark PLLC's capital account would be $792,497; and Newman PLLC's capital account balance would be $200,000.[17]

---

[15] The 2013 LLC Agreement uses the terms "Capital Account," "Net Book Value Capital Account," and "Tangible Net Worth Capital Account" interchangeably throughout, and the parties have stipulated that each of these terms refers solely to the single capital account of each partner.

[16] The 2013 LLC Agreement defines "Net Profit" as "an amount equal to the Company's taxable income or loss . . . determined in accordance with Code Section 703(a) [regarding the computation of partnership taxable income, deductions, and related partnership elections]".

[17] As we mention below in note 58, the fact that the partners negotiated these capital account balances leaves open the possibility that the partners might not have calculated them in accordance with the capital account maintenance rules under Treasury Regulation § 1.704-1(b)(2)(iv). However, the Commissioner does not contest the partners' agreed upon capital account balances, and so we accept these balances as accurate. Upon commencement of his employment by CRC, Mr. Newman did not

**[*13]** Town PS also agreed to increase its capital account over the next five years, and accordingly made a $10,000 cash contribution to CRC before the end of 2012, increasing its capital account balance to $160,000.

### 2.    *Allocation of net profits and losses*

Section 8.1 of the 2013 LLC Agreement allocates "Net Profit [and] Loss" of CRC among its partners using a multi-step formula. Profit and loss are allocated under Section 8.1 in the following order and priority: First, income equal to "10% of the average Tangible Net Worth[18] reflected in each Member's Net Book Value Capital Account for the year" is allocated to each partner. Second, Clark PLLC "receive[s] a special allocation of taxable income with respect to the amounts collected on the Accounts Receivable that have been reserved for non-collectability".[19] Finally, all remaining income is allocated according to the FMG system.[20] The 2013 LLC Agreement also allocates income, gain, loss, and deductions according to its proportional "Net Profits [and] Loss" allocation formula.[21]

However, section 8.1 begins by noting that its allocations are "subject to [the special allocation provisions of] Section[] 8.3". Section 8.3 (entitled "Special Allocations") establishes a "Qualified Income Offset" ("QIO"), whereby "[i]n the event that any Member unexpectedly receives any adjustments, allocations, or distributions[,] . . . items of Company income and gain [are] specially allocated to such Member in an amount and in a manner sufficient to eliminate as quickly

---

have a "book of business", and the initial balances of Newman PLLC's, Town PS's, and Clark PLLC's capital accounts did not include the value of any intangible assets.

[18] The 2013 LLC Agreement defines "Tangible Net Worth" to be "the net book value of the Company, . . . [including] marketable securities, real estate, tangible personal property, and other similar assets . . . [and] in the case of [a] Withdrawal Event other than by mutual agreement or retirement, such amount [is] reduced by liabilities".

[19] The parties have stipulated that the "amount[] collected on the Accounts Receivable that [was] reserved for non-collectability" in 2013 was $15,387.

[20] The parties have stipulated that the remaining income under this step is allocated 100% to Clark PLLC for 2013.

[21] Section 8.7 of the 2013 LLC Agreement defines "Net Profit or Net Loss" as "an amount equal to [CRC's] taxable income or loss [for each fiscal year], determined in accordance with Code Section 703(a)".

**[\*14]** as possible[] . . . the Deficit Capital Account of the Member".[22] This QIO provision is significant in our analysis below.

   3. *AAV system*

   Articles 10 and 11 of the 2013 LLC Agreement (along with definitions in Article 1) provide a method for computing retirement payments for a retiring partner in a manner that takes account of, among other things, CRC's "goodwill".

   "Average Annual Value" is defined in Section 1.6 to mean "the goodwill *value* of the Company, calculated as one times the annual accrual basis net client fee revenue of the Company" (emphasis added); and under Section 1.7, the "Average Annual Value Method" is "the method pursuant to which an individual Member is allocated his portion of the Average Annual Value".

   Article 10 of the 2013 LLC Agreement, entitled "Accumulated Annual Value Method", provides the method by which each partner's "AAV account" (a term not defined in the 2013 LLC Agreement) is adjusted annually. Each partner's "AAV" is adjusted up or down in accordance with the ratio of income allocations under the FMG system (Article 8 of the 2013 LLC Agreement). Upon a partner's withdrawal, the partner's AAV is "adjusted for any changes in client relationships that would result in a material decrease in fees billed" before any AAV distribution to the partner. Upon voluntary withdrawal from the company, the withdrawing partner forfeits "50% of any vested right to AAV retirement payments".

   Article 11 of the 2013 LLC Agreement, entitled "Member Retirement Payments", provides the method for calculating payments to retiring partners.[23] The retiring partner first receives a payment equal to his capital account balance, then a payment equal to "85% of the retiring member's AAV account on the date of retirement".

---

   [22] The 2013 LLC Agreement defines the "Deficit Capital Account" of any partner as "the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to [certain] adjustments".

   [23] Certain vesting requirements apply to the payments, but "[i]n order to receive full payment of vested retirement benefits, the retiring Member must make a best efforts commitment to actively transition the Company's clients to the remaining Members during [the period of transition]."

**[\*15]** Clark PLLC, Town PS, and Newman PLLC agreed that the parties' beginning AAV balances would be: $2,650,000 for Clark PLLC; $700,000 for Newman PLLC; and $314,200 for Town PS. Clark PLLC's and Town PS's initial AAV balances were intended to reflect the value of Clark PLLC's goodwill in CRC and Mr. Town's book of business.

### 4. *Contributions*

Section 7.1 of the 2013 LLC Agreement states that "[e]ach Member shall contribute such amount as is set forth in . . . Schedule 1 (or as shown on the books of the Company) as such Member's share of the Members' initial Capital Contribution."[24] Schedule 1, entitled "Member and Class B Unit Holder[25] Information (as of December 31, 2011)" consists of a table with each partner's name and address, AAV balance, capital account balance, and number of respective voting or non-voting units, with a total for each column on the last row of the table. The AAV balance for each partner mirrors the balances negotiated by the partners, and Clark PLLC, Newman PLLC, and Town PS each hold an amount of Class A units equal to their respective AAV balances (2,650,000 units for Clark PLLC, 700,000 units for Newman PLLC, and 314,200 units for Town PS—for a grand total of 3,664,200 units across all partners). The table shows a zero balance in each partner's capital account column (contrary to the partners' agreement regarding initial capital account balances), and the total for this column (theoretically showing the sum of all capital accounts) likewise reflects a zero balance.

Asterisks appear next to each partner's name and link to footnotes appearing below the table. The footnote corresponding with Clark PLLC states that Clark PLLC's initial capital contribution consisted of "[f]ormation costs, contribution of property from predecessor

---

[24] Under the 2013 LLC Agreement, "Capital Contribution" means any contribution to the capital of CRC in cash, or the fair market value of property contributed.

[25] Under the 2013 LLC Agreement, a "Class B Unit Holder" is an "owner of Class B Units", which are "Units issued which do not have an initial Capital Account and do not have any voting rights associated with them." Schedule 1 lists one "Class B Unit Holder", "Tony Chang, CPA". Tony H. Chang was an employee of CRC in 2013. It is unclear from the parties' stipulations and attached exhibits whether Mr. Chang (or the professional limited liability company he organized, Tony H. Chang, CPA, PLLC) was a member of CRC for state law purposes. The parties do not raise (or rebut) the issue of whether Mr. Chang or Tony H. Chang, CPA, PLLC, was a partner for federal income tax purposes in 2013, so we do not address that issue in this Opinion.

[*16] Company, and buy-out of former Members (including inventory, business assets and equipment, goodwill and all other tangible and intangible property) and other amounts shown on the books of the Company". Newman PLLC and Town PS share a single footnote stating that their initial capital contributions consisted of "amounts as shown on the books of the Company."

5. *Distributions*

Article 9 of the 2013 LLC Agreement is entitled "Distributions from the Company". Cash distributions are made pursuant to Section 9.1 ("Net Profit Distributions") "in the Manager's reasonable discretion, provided that such Distributions will be consistent with the allocations of income made pursuant to Section 8.1" (regarding allocation of net profit and loss).

Section 9.3 provides for "Distributions In-Kind". Section 9.3(a), addressing "Non-cash assets", is especially significant in our analysis below. Section 9.3(a) states that any such assets "shall be distributed in a manner that reflects how cash proceeds from the sale of such assets for fair market value would [be] distributed (after any unrealized gain or loss attributable to such noncash assets has been allocated among the Members in accordance with Article 8)". That is, Section 9.3(a) requires that unrealized gain be allocated among the partners ("in accordance with Article 8")[26] and that non-cash assets be distributed like cash proceeds (which, under Section 9.1, would be "in the Manager's reasonable discretion" but "consistent with the allocations of income made pursuant to Section 8.1").

Section 9.3(b) of the 2013 LLC Agreement states for the distribution in kind of a particular non-cash asset—i.e., "Clients"—"If any Clients are Distributed under this Agreement, the value of such Client shall be the Client Value" (defined in Section 1.19 as the "gross revenue as invoiced to the Client over the prior twelve-month period").[27]

---

[26] As to allocation of income, Section 8.6(a) similarly states that "income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Net Profits or Net Losses" (i.e., under Section 8.1). Distributions involve "the Manager's reasonable discretion" under Section 9.1, but income allocation is simply stated as being made pursuant to the formula of Section 8.1.

[27] This definition varies slightly from the 2009 LLC Agreement's definition of Client Value as the "gross revenue *generated from* the Client over the prior twelve-month period". (Emphasis added.)

**[\*17]** Absent from the 2013 LLC Agreement is the 2009 LLC Agreement's specific provision (in Section 11.1, quoted above) that a *withdrawing* partner has an "option to receive a Distribution" from CRC consisting of "Clients". But Section 9.3(b) of the 2013 LLC Agreement plainly presumes that "Clients [may be] Distributed under this Agreement".

Upon voluntary withdrawal, a partner is entitled to a distribution in an amount equal to his positive capital account balance, with the exception that Town PS is not entitled to a distribution unless its "Tangible Net Worth exceeds $150,000 [or] until Clark [PLLC] is paid in full".[28]

In the event of a liquidation, after repayment of CRC's creditors, the 2013 LLC Agreement states that liquidating distributions are made "[t]o the Members in repayment of the positive balances of their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year during which the liquidation occurs".

### 6. *Non-solicitation agreement*

The 2013 LLC Agreement contains a non-solicitation agreement whereby the partners agree (for a period of two years) that a withdrawing partner will not provide services to or solicit any current or prospective[29] client of CRC, remove client files from CRC's offices, or hire or solicit CRC employees. Partners who violate the non-solicitation agreement agree to pay certain financial penalties relative to the category of violation. For example, for violations relating to clients the violating partner must pay to CRC a penalty equal to a portion of the

---

[28] Because of the apparent omission of a conjunction, it is unclear whether the exception carved out for Town PS imposes two limitations (i.e., that its capital account must have a positive balance of at least $150,000 *and* that the loan from Clark PLLC must be paid off entirely) or one (i.e., either of the two criteria). We assume the latter and interpolate "or".

[29] Under the 2013 LLC Agreement, a prospective client is one with whom the company has had direct communication within the 24 months before the partner's withdrawal.

[*18] client's billings in the prior or subsequent year (depending on the client's status as current or prospective).

IV.    *Newman PLLC's and Town PS's withdrawal as partners*

Effective May 1, 2013 (i.e., not quite four months after the execution of the 2013 LLC Agreement), Newman PLLC and Town PS withdrew as partners of CRC.  Mr. Newman and Mr. Town thereafter started their own CPA firm, practicing under the name of "Newman Town, PLLC" (hereinafter, "NT PLLC")

A.    *Book of business*

Certain clients of CRC thereafter ceased engaging CRC and retained the services of NT PLLC.  That is, the withdrawing partners took with them a "book of business".  We find (as the parties have stipulated) that, under the terms of the 2013 LLC Agreement, the "Client Value" of the clients that retained NT PLLC was $742,569, that the portion of this total "Client Value" allocable to Newman PLLC was $318,144, and that the portion allocable to Town PS was $424,425.

B.    *Civil litigation*

The WTB Loan remained outstanding at the time Newman PLLC withdrew from CRC.  Pursuant to the guaranty that Mr. Clark signed, Washington Trust Bank looked to Mr. Clark for repayment of the loan.

Mr. Clark thereafter filed a civil lawsuit in the King County Superior Court of the State of Washington, suing Newman PLLC, Mr. Newman, and Mr. Newman's spouse, praying for relief in an amount equal to the outstanding balance of the WTB Loan, with interest.  The parties engaged in arbitration and mediation, with Mr. Town joining the proceedings some time thereafter.

In preparation for mediation, each party filed a "Statement of Claims".  Among other items, Mr. Clark claimed that Messrs. Newman and Town breached the 2013 LLC Agreement and their fiduciary duty to CRC when they "took CRC clients . . . [and] competed against CRC".  Mr. Clark's statement sought relief for, among other things, the "value of the practice grown by [Mr. Newman] at CRC".[30]  Messrs. Newman

---

[30] Mr. Clark's statement also requested relief for other items incident to Newman PLLC's and Town PS's withdrawal from CRC that are not directly related to the issue in this case.

**[\*19]** and Town requested relief for compensation they argued was outstanding from CRC.

C.   *Settlement*

In October 2013, CRC, Mr. Clark, Clark PLLC, Mr. Newman, Newman PLLC, Mr. Town, and Town PS agreed to settle the civil lawsuit and arbitration and entered into a "Civil Rule 2A Agreement" outlining the terms of the agreed settlement. In February 2014 they executed a "General Release and Settlement Agreement" ("Settlement Agreement",[31] Ex. 33–J (Doc. 33, at 620)) to finalize the settlement terms.[32] The Settlement Agreement acknowledged the 2013 LLC Agreement that the parties had executed in January 2013 and settled all claims relating to Mr. Newman's and Mr. Town's departure from CRC and resolved all claims (known or unknown) that the parties brought or could have brought in the civil lawsuit or arbitration proceedings.

The Settlement Agreement stated that "Newman PLLC" and "Town PS" would make the $200,000 capital contribution to CRC (although it did not specify the denomination of capital contribution that each entity would make—e.g., $100,000 each or otherwise).

The Settlement Agreement resolved the controversy about the clients that Newman PLLC and Town PS had taken with them when they withdrew from CRC. Clark PLLC had previously proposed an "Agreement Regarding Client File Transfer Procedure", which had "anticipate[d] that certain clients of CRC [would] wish to have NT PLLC provide accounting and tax service" and had set out the routine by which

---

[31] The terms of the Settlement Agreement generally reflected the terms of the Civil Rule 2A Agreement, but some provisions of the Settlement Agreement were more specific. For example, the Settlement Agreement provided that "Newman, PLLC" and "Town, PS" would make a $200,000 capital contribution to CRC, whereas the Civil Rule 2A Agreement simply stated that "Newman Town" would make such a capital contribution.

[32] The parties stipulated that all exhibits (including the Settlement Agreement) could "be accepted as authentic . . . ; provided, however, that either party [had] the right to object to the admission of any such . . . exhibits in evidence on the grounds of materiality and relevancy, but not on other grounds unless expressly reserved [therein]". Neither party raised an objection regarding the admission of the Settlement Agreement. Therefore, by failing to make a timely and specific objection on the basis of Rule 408 of the Federal Rules of Evidence, CRC has waived its right to contest the admission of the Settlement Agreement on that ground. *See, e.g.*, *Gilbrook v. City of Westminster*, 177 F.3d 839, 859 (9th Cir. 1999).

[*20] CRC would transfer client records, working papers, and working files to NT PLLC. In the Settlement Agreement, NT PLLC agreed to sign this transfer agreement and agreed not to provide accounting services to any "*current client* of [CRC] for 2 years". (Emphasis added.) Each CRC partner-entity, former partner-entity, and their respective individual partners signed the Settlement Agreement. As is noted above, the parties to this case have stipulated that, under the terms of the 2013 LLC Agreement, the "Client Value" of the clients that retained NT PLLC was $742,569, of which $318,144 was allocable to Newman PLLC and $424,425 was allocable to Town PS.

### D. *Adjustments to capital accounts*

CRC made certain adjustments to the capital accounts of the partners after the withdrawal of Newman PLLC and Town PS. CRC first decreased Newman PLLC's capital account by $419,043 and decreased Town PS's capital account by $447,437, to account for property distributions that it reported to each of those partners.[33] It then decreased Town PS's capital account further by $150,000 and increased Clark PLLC's capital account by the same $150,000 (and later reported this $150,000 capital account increase as a capital contribution by Clark PLLC).[34] CRC did not adjust Newman PLLC's or Town PS's capital account to reflect the allocations of any inherent gain in the property distributions before decreasing the partners' capital accounts in the amounts of the distributions.

### V. *Realization of ordinary income*

CRC realized $563,118 of ordinary business income for 2013. This fact is not in dispute. Rather, the dispute is about how that income should be allocated among CRC's partners for tax purposes.

### VI. *CRC's federal returns of partnership income*

CRC is a calendar year taxpayer and filed as a partnership for federal income tax purposes for 2011, 2012, and 2013. CRC was subject to the TEFRA partnership procedures set forth in Code sections 6221–6234 for the years 2011, 2012, and 2013. For each of these years,

---

[33] *See* discussion *infra* p. 23 (regarding the reported distributions to Newman PLLC and Town PS).

[34] *See* discussion *infra* note 39 (regarding the reported capital contribution by Clark PLLC).

**[*21]** Mr. Clark served as CRC's tax return preparer, and the company used a cash receipts and disbursements method of accounting.

A.   *2011*

CRC filed its 2011 Form 1065 in September 2012, and reported that its partners were Clark PLLC, Town PS, and Benbow PS.  On its attached Schedule L, "Balance Sheets per Books", CRC reported $1,512,905 as its amount of intangible assets at the beginning of the year, and zero as its amount of intangible assets at the end of the year.

[*22] The Schedules K–1, "Partner's Share of Income, Deductions, Credits, etc.", issued to the partners reported the following information:

|  | Clark PLLC | Town PS | Benbow PS |
|---|---|---|---|
| Beginning capital account balance | $1,834,050 | $466,146 | $479,297 |
| Capital contributions[35] | 238,766 | 7,727 | — |
| Income allocations (net of deductions) and other items (e.g., nondeductible expenses) | 665,014 | 129,920 | 148,909 |
| Distributions |  |  |  |
| Cash | 549,329 | 102,653 | 113,922 |
| Property | 1,396,004 | 351,140 | 514,284 |
| Ending capital account balance[36] | 792,497 | 150,000 | -0- |

[35] Neither Clark PLLC nor Town PS actually made in 2011 a capital contribution equal to the reported contribution amounts. The upward adjustments to Clark PLLC's and Town PS's capital accounts correspond to reductions in Benbow PS's capital account upon its withdrawal. CRC does not offer any explanation regarding these adjustments.

[36] Clark PLLC's and Town PS's reported ending capital account balances for 2011 resulted from the negotiation between Clark PLLC, Newman PLLC, and Town PS. *See* discussion *supra* pp. 12–13. In computing the ending capital account balance for each of the partners, CRC did not include the book value, fair market value, or tax basis of any intangible assets, such as goodwill, client-based intangible assets, or covenants not to compete.

[*23]  B.    *2012*

CRC filed its 2012 Form 1065 in September 2013, and reported that its partners were Clark PLLC, Newman PLLC, and Town PS.  CRC did not report any intangible assets on its Schedule L for 2012.

The Schedules K–1 issued to the partners reported the following information:

|  | Clark PLLC | Town PS | Newman PLLC |
|---|---|---|---|
| Beginning capital account balance | $792,497 | $150,000 | — |
| Capital contributions | — | 10,000 | 200,000 |
| Income allocations (net of deductions) and other items (e.g., nondeductible expenses) | 1,259,382 | (1,817) | (983)[37] |
| Distributions |  |  |  |
|     Cash | 903,585 | 61,545 | 164,045 |
|     Property | 16,745 | — | — |
| Ending capital account balance[38] | 1,131,549 | 96,638 | 34,972 |

---

[37] This net figure includes, among other items, an allocation of a loss to Newman PLLC in the amount of −$3,118.

[38] In computing the ending capital account balance for each of the partners, CRC did not include the book value, fair market value, or tax basis of any intangible assets.

**[*24]** C.  *2013*

CRC filed its 2013 Form 1065 in September 2014, and issued Schedules K–1 to Clark PLLC, Newman PLLC, and Town PS. CRC did not report any intangible assets on its Schedule L for 2013.

The Schedules K–1 issued to the partners reported the following information:

|  | *Clark PLLC* | *Town PS* | *Newman PLLC* |
|---|---|---|---|
| Beginning capital account balance | $1,131,549 | $96,638 | $34,972 |
| Capital contributions[39] | 150,000 | 100,000 | 100,000 |
| Income allocations (net of deductions) and other items (e.g., nondeductible expenses) | 789,987 | 255,799 | 307,759 |
| Distributions |  |  |  |
| Cash | 632,201 | 5,000 | 23,688 |
| Property | — | 447,437 | 419,043 |
| Ending capital account balance[40] | 1,439,335 | -0- | -0- |

---

[39] Clark PLLC did not in fact make a $150,000 capital contribution in 2013. On CRC's general ledger for the period January 1 through December 31, 2013, CRC debited Town PS's capital account by $150,000 and credited Clark PLLC's capital account by the same $150,000. CRC reported capital contributions by Newman PLLC and Town PS in 2013 to reflect the $200,000 payment CRC received in March 2014 pursuant to the partners' Settlement Agreement.

[40] In computing the ending capital account balance for each of the partners, CRC did not include the book value, fair market value, or tax basis of any intangible assets.

[*25] VII.    *Newman PLLC's and Town PS's Forms 8082*

In September 2014 Newman PLLC and Town PS each filed Forms 8082, "Notice of Inconsistent Treatment or Administrative Adjustment Request (AAR)", with respect to CRC's 2013 issued Schedules K–1 that reported the following information:[41]

*Newman PLLC—Form 8082*

|  | Ordinary income (loss) | Property distributions |
|---|---|---|
| Schedule K–1 issued to Newman PLLC | $307,759 | $419,043 |
| Form 8082 filed by Newman PLLC | -0- | 183,737 |

*Town PS—Form 8082*

|  | Ordinary income (loss) | Property distributions |
|---|---|---|
| Schedule K–1 issued to Town PS | $255,799 | $447,437 |
| Form 8082 filed by Town PS | 5,000 | -0- |

---

[41] The Forms 8082 also reported variations in the guaranteed payments each partner received, but neither the variations nor the guaranteed payments are pertinent to this case.  Newman PLLC's Form 8082 reported a cash distribution amount of $20,000 (compared to the $23,688 reported on its Schedule K–1), but the parties have stipulated that the amount of cash distributed to Newman PLLC in 2013 was $20,000, and so we exclude that item from discussion. Newman PLLC also filed a Form 8082 for the 2012 tax year, in which it contested CRC's allocation of a loss of −$3,118 to Newman PLLC.  Instead, Newman PLLC reported an income allocation of $167,872.  The Commissioner contests the validity of CRC's 2012 allocations of income in his brief, and we address his contentions in our discussion below in note 67.

[*26] VIII.   *Proceedings before the IRS*

A.   *CRC's partnership-level proceeding*

In response to Newman PLLC's and Town PS's filed Forms 8082, the IRS conducted a partnership-level audit of CRC's 2013 Form 1065. On August 24, 2016, the IRS issued the Letter 1787–F, "TMP Notice of Beginning of Administrative Proceedings", to notify Clark PLLC that the IRS was beginning an administrative partnership-level audit of CRC's 2013 Form 1065. On November 6, 2017, the IRS issued a Letter 1827–F proposing adjustments to partnership items on CRC's 2013 Form 1065 and notifying the TMP of its right to file a protest to the IRS Appeals Office ("IRS Appeals").[42]

B.   *Notice of Final Partnership Administrative Adjustment*

On December 17, 2018, IRS Appeals issued the TMP an FPAA determining adjustments to CRC's 2013 Form 1065.

The FPAA largely adjusted CRC's reported property distributions and income allocations consistently with the corrections proposed by Newman PLLC and Town PS.[43]  With regard to property distributions, the IRS determined: (1) reported "client distributions" of $705,249 were not distributions and should be disregarded, or, in the alternative, CRC failed to substantiate the identities and the values of the clients distributed (and it failed to show that CRC was capable of valuing the clients distributed), and therefore the distributions should be disregarded; and (2) a remaining distribution of $183,737 should be disregarded because it was the result of a bank loan owed personally by

---

[42] On July 10, 2017, Clark PLLC, as the TMP of CRC, signed a Form 872–P, "Consent to Extend the Time to Assess Tax Attributable to Partnership Items", extending the period for assessing tax provided for in section 6229(a) to December 31, 2019, for the 2013 tax year.

[43] The FPAA also determined certain adjustments to CRC's reported ordinary income, guaranteed payments, business deductions, and cash distributions, and that CRC was liable for an accuracy-related penalty under section 6662(a).  The parties settled each of these issues before submitting their joint motion to submit the case pursuant to Rule 122.  *See supra* note 3.

**[\*27]** a partner who subsequently defaulted.[44] The FPAA also determined that

> [CRC's] reported allocation of [o]rdinary income [to Newman PLLC and Town PS] had no substantial economic effect, was not consistent year to year, and did not use the allocation method described in Article 8 of the [2013 LLC Agreement] . . . [and that] [t]he allocation of [o]rdinary [i]ncome should be based on known amounts received by the partners.

The FPAA determined that ordinary income should be allocated as follows: $538,118 to Clark PLLC, $20,000 to Newman PLLC, and $5,000 to Town PS.

### C.    *Newman PLLC's and Town PS's Forms 870–PT*

In December 2017 Newman PLLC and Town PS executed Forms 870–PT, "Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax and Additional Amounts", regarding CRC's 2013 taxable year, and the IRS countersigned in January 2018. Each Form 870–PT determined, similarly to the FPAA, that the partner's distributive share of ordinary income should be allocated: $538,558 to Clark PLLC, $20,000 to Town PS, and $5,000 to Newman PLLC.[45] (These agreements resolve the tax consequences of the withdrawal for Town PS and Newman PLLC, so we do not adjudicate here any claim by those entitles. Rather, at issue here

---

[44] The FPAA also disregarded certain "silent distributions" of $80,000 reported on the Form 1065. Although the parties do not address this item specifically in their stipulations of settled issues, in their joint motion to submit the case pursuant to Rule 122, the parties agree that the remaining legal issues in dispute are limited to (1) "whether CRC made or was deemed to have made additional property distributions to [Newman PLLC] and [Town PS (beyond the $183,737 property distribution to Newman PLLC relating to the WTB Loan)] during 2013" and (2) "whether CRC's ordinary income allocations as reported on its 2013 Form 1065 had substantial economic effect." Therefore, we do not address whether the IRS's determination regarding "silent distributions" should be sustained or denied.

[45] The Forms 870–PT thus stated Clark PLLC's allocation as $538,558 rather than $538,118 as in the FPAA, and they "swapped" the income allocation amounts for Newman PLLC and Town PS that were determined in the FPAA—i.e., the FPAA allocated $20,000 of income to Newman PLLC and $5,000 of income to Town PS, but the Form 870–PT allocated $20,000 of income to Town PS and $5,000 of income to Newman PLLC. We need not resolve these discrepancies.

**[\*28]** are CRC's income allocations that ultimately affect Clark PLLC only.)

## IX.   *Tax Court proceedings*

CRC's petition contesting the FPAA was timely filed in this Court on January 30, 2019.  The parties filed three stipulations of settled issues, resolving their disagreements regarding multiple determinations in the FPAA, and leaving the remaining issues for our decision.  The parties also filed a stipulation of facts and a supplement to that stipulation.  On January 5, 2021, the parties filed a joint motion to submit the case pursuant to Rule 122, and we granted the motion on January 27, 2021.

## OPINION

## I.   *Applicable legal principles*

### A.   *Jurisdiction to determine partnership items*

Under the default rules of Treasury Regulation section 301.7701-2(a) and (c)(1), noncorporate entities with more than one member (such as LLCs) are treated as partnerships for federal tax purposes.[46]  Because CRC's TMP filed the Petition for readjustment of partnership items within 90 days of the Commissioner's FPAA, we have jurisdiction under section 6226(f) to determine all of CRC's "partnership items" for 2013 and the proper allocation of those items among its partners.  Section 6231(a)(3) defines "partnership item" as "any item required to be taken into account for the partnership's taxable year under any provision of subtitle A [sections 1–1563] to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level".  Treasury Regulation section 301.6231(a)(3)-1(a)(1)(i) provides that partnership items include the partnership aggregate and each partner's share of items of income, gain, loss, deduction, or credit of the partnership.  Thus, the income allocations to partners that CRC reported on its 2013 Form 1065 (and whether they have substantial economic effect) are partnership items that are subject to

---

[46] "A business entity with two or more members is classified for federal tax purposes as either a corporation or a partnership . . . [and] [t]he term partnership means a business entity that is not a corporation . . . and that has at least two members." Treas. Reg. § 301.7701-2(a), (c)(1).

**[\*29]** redetermination in this partnership-level proceeding. Neither party to this case contends otherwise.

### B. *Burden of proof*

As a general rule, the Commissioner's determinations in an FPAA are presumed correct, and the taxpayer has the burden of proving them incorrect. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). The Commissioner, however, bears the burden of proof with respect to any new matter, increase in deficiency, and affirmative defenses pleaded in the answer. Rule 142(a). Petitioner does not allege that its burden should shift to the Commissioner for any issue in this case, and thus, petitioner bears the burden of proof.

### C. *Partnership intangible assets*

Business entities may own intangible assets. *See, e.g.*, *Tomlinson v. Commissioner*, 58 T.C. 570, 580 (1972) ("We have long recognized that these intangibles [including customer lists] are capital assets"), *aff'd*, 507 F.2d 723 (9th Cir. 1974); *Topeka State J., Inc. v. Commissioner*, 34 T.C. 205, 215, 221 (1960) ("It is well established that [subscription lists] are an intangible asset of a newspaper [company]").[47] Intangible assets are generally included in the valuation of a partnership (and partnership interest). *See, e.g.*, *Watson v. Commissioner*, 35 T.C. 203, 208, 214 (1960) (holding that purchase price for partnership included payment for tangible assets and goodwill); *Tolmach v. Commissioner*, T.C. Memo 1991-538.

A "client-based intangible" asset (such as a customer list or "book of business"[48]) is one example of an intangible asset, and it may be capable of valuation, distribution, and sale to third parties. *See, e.g.*, *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 570 (1993) (holding that a corporation proved that a customer list of "'paid

---

[47] The Code and the Treasury Regulations also anticipate that partnerships will own intangible assets by providing an amortization deduction for the capitalized costs of intangibles owned by the partnership (for federal income tax purposes), *see generally* § 197, and requiring the inclusion of intangible assets in the valuation of a transferred business interest (for federal gift tax purposes), *see generally* Treas. Reg. §§ 1.197-2, 25.2512-3.

[48] A "book of business" generally has value. *See, e.g.*, *Mitchell v. Garrison Protective Servs., Inc.*, 819 F.3d 636, 641 (2d Cir. 2016) (affirming the district court's valuation of a book of business).

**[*30]** subscribers' constitute[d] an intangible asset with an ascertainable value and a limited useful life, the duration of which [could] be ascertained with reasonable accuracy" for depreciation purposes); *JHK Enters., Inc. v. Commissioner*, T.C. Memo. 2003-79, 85 T.C.M. (CCH) 1032, 1032 ("Among the assets received by [the partner] in the liquidating distribution were client files, a client list, going concern value (goodwill), and equipment"); *Holden Fuel Oil Co. v. Commissioner*, T.C. Memo. 1972-45, 31 T.C.M. (CCH) 184, 187–89 (holding that where the taxpayer purchased customer lists from another company it was entitled to an amortization deduction for a portion of the amount paid), *aff'd*, 479 F.2d 613 (6th Cir. 1973).

The Commissioner disputes the existence of the client-based intangible that petitioner asserts and CRC's ability to distribute such an asset, and we address that dispute below in Part II.A.

  D. *Substantial economic effect*

   1. *General principles*

Section 704(a) provides that the partnership agreement[49] generally determines a partner's distributive share of partnership income, gain, loss, deductions, or credits of the partnership. However, the partners' ability to allocate partnership items on a basis other than the partners' interests in the partnership (i.e., a non-pro rata "special allocation") is not unrestricted. Special allocations must have substantial economic effect (as opposed to the mere avoidance of tax); otherwise, the partners' distributive shares of partnership items "shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances)". § 704(b). The regulations under section 704(b) describe in detail not only the circumstances in which a special allocation will have "substantial economic effect" but also the manner of determining a partner's "interest in the partnership".

The regulations provide that a special allocation of partnership items is deemed to have economic effect if, in the event there is an economic benefit or burden that corresponds to an allocation, the partner to whom the special allocation is made receives a corresponding benefit or bears a corresponding burden. *See* Treas. Reg.

---

[49] The term "partnership agreement" includes all agreements among the partners, or between one or more partners and the partnership, concerning affairs of the partnership and responsibilities of partners. Treas. Reg. § 1.704-1(b)(2)(ii)(h).

[*31] § 1.704-1(b)(2)(ii)(*a*).  A determination to this effect is made as of the end of the partnership taxable year to which the allocation relates. Treas. Reg. § 1.704-1(b)(2)(i).  Moreover, the economic effect of the special allocation must be substantial; this requires "a reasonable possibility that the allocation (or allocations) will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences."  Treas. Reg. § 1.704-1(b)(2)(iii)(*a*).

Determinations of substantial economic effect, as well as determinations of a partner's interest in the partnership, depend upon an analysis of the partners' capital accounts.  *See* Treas. Reg. § 1.704-1(b)(2)(iv)(*a*).  Generally, a partner's capital account represents the partner's equity investment in the partnership.  The capital account balance is determined by adding (1) the amount of money that the partner contributes to the partnership, (2) the fair market value of other property the partner contributes (net of liabilities to which the property is subject or which are assumed by the partnership), and (3) any allocations of partnership income or gain.  Treas. Reg. § 1.704-1(b)(2)(iv)(*b*).  A partner's capital account is decreased by (1) the amount of money distributed to him by the partnership, (2) the fair market value of property distributed to the partner (net of any liability that the partner assumes or to which the property is subject), and (3) the amounts of partnership losses and deductions allocated to the partner. *Id.*  An allocation of partnership items can have substantial economic effect only if the partnership maintains capital accounts of the partners in accordance with these rules.  *Id.*

2.     *Tests for economic effect*

The regulations governing special allocations provide three tests for economic effect.  Special allocations of items to a partner are deemed to have economic effect if they meet the requirements of any one of these alternative tests:

a.     *Basic test of economic effect*

The basic test for economic effect is set forth in Treasury Regulation section 1.704-1(b)(2)(ii)(*b*).  The test provides, in general, that a special allocation has economic effect if it is made pursuant to a partnership agreement that contains provisions requiring: (1) the determination and maintenance of partners' capital accounts in accordance with the rules of Treasury Regulation section 1.704-1(b)(2)(iv); (2) upon liquidation of the partnership, the proceeds of

**[\*32]** liquidation be distributed in accordance with the partners' positive capital account balances; and (3) upon liquidation of the partnership, any partner with a deficit capital account balance is unconditionally obligated to restore the amount of the deficit balance to the partnership by the end of the taxable year (commonly referred to as a "deficit restoration obligation" or "DRO"). Treas. Reg. § 1.704-1(b)(2)(ii)(*b*). This test ensures that the economic benefits or burdens corresponding to any given special allocation are borne by the partner receiving the allocation.

b.       *Alternate test of economic effect*

Partnership agreements may provide for specific limits upon the amount the limited partners are required to contribute to the partnership.  These limits on liability, however, are inconsistent with the requirement in the basic test that each partner must agree to repay the deficit balance (if any) in that partner's capital account upon liquidation.  Consequently, the regulations include an "[a]lternate test for economic effect", which provides that special allocations of partnership items may have economic effect even in the absence of a deficit restoration obligation.

The alternate test begins by incorporating the first two parts of the basic test. (That is, the partnership agreement must (1) provide for properly maintained capital accounts and (2) provide that the proceeds of liquidation will be distributed in accordance with the partners' positive capital account balances.)  However, instead of a negative capital account makeup requirement, the alternate test mandates a hypothetical reduction of the partners' capital accounts.  Specifically, the alternate test requires that capital accounts be reduced, as of the end of the year, for any allocation of loss or deduction or distributions that, at that time, are reasonably expected to be made, to the extent that such allocations or distributions exceed reasonably expected increases to the partners' capital account.[50]  *See* Treas. Reg. § 1.704-1(b)(2)(ii)(*d*).

The alternate test also requires that the partnership agreement provide for a QIO, i.e., a "qualified income offset".  A QIO provision automatically allocates partnership income (including gross income and gain) to a limited partner who has an unexpected negative capital account, either as a result of partnership operations or as a result of

---

[50] By requiring a prospective reduction of capital accounts, the alternate test serves to preclude a limited partner from timing the receipt of deductible partnership expenses in a way that would enable a partner to accumulate a negative capital account that the partner need not repay.

**[\*33]** making the adjustment for reasonably expected reductions. The QIO must operate "in an amount and manner sufficient to eliminate such deficit balance as quickly as possible." Treas. Reg. § 1.704-1(b)(2)(ii)(*d*) (flush text).

### c.       *Economic equivalence test*

There is a third economic effect test, referred to as the "economic equivalence" test. Treasury Regulation section 1.704-1(b)(2)(ii)(*i*) provides that, if an allocation would produce the economic equivalent of meeting the basic test for economic effect, it will be deemed to have economic effect even if it does not otherwise meet the formal requirements of the basic test. We address this issue below in Part II.B.3.

### E.       *Partner's interest in the partnership*

Section 704(b) provides that an allocation of partnership income, gain, loss, deductions, or credit (or item thereof) that does not have substantial economic effect will be "determined in accordance with the partner's interest in the partnership". A "partner's interest in the partnership" is defined as the "manner in which the partners have agreed to share the economic benefit or burden (if any) corresponding to the income, gain, loss, deduction, or credit (or item thereof) that is allocated." Treas. Reg. § 1.704-1(b)(3)(i). The partners'

> sharing arrangement may or may not correspond to the overall economic arrangement of the partners. . . . [I]n the case of an unexpected downward adjustment to the capital account of a partner who does not have a deficit make-up obligation that causes such partner to have a negative capital account, it may be necessary to allocate a disproportionate amount of gross income of the partnership to such partner for such year so as to bring that partner's capital account back up to zero.

*Id.* Accordingly, an examination of a partner's interest in the partnership "shall be made by taking into account all facts and circumstances relating to the economic arrangement of the partners." *Id.* Among the relevant factors to be taken into account in determining the partners' interests in the partnership are: (1) the partners' relative contributions to the partnership, (2) the interests of the respective partners in profits and losses (if different from that in taxable income or loss), (3) the partners' relative interests in cash flow and other non-

**[\*34]** liquidating distributions, and (4) their rights to distributions of capital upon liquidation.[51]  Treas. Reg. § 1.704-1(b)(3)(ii).

We address the Commissioner's contentions as to a "partner's interest in the partnership" below in Part II.C.

### F.  *Partnership distributions*

The basic capital accounting rules in Treasury Regulation section 1.704-1(b)(2)(iv)(*b*) require that partners' capital accounts be decreased by the fair market values of property distributed to them by the partnership.  Treas. Reg. § 1.704-1(b)(2)(iv)(*e*)(*1*).  If property is in fact distributed, then these rules must be applied even if the partners and the partnership overlook the distribution or attempt to impose another characterization on it.  *See, e.g.*, *Seay v. Commissioner*, T.C. Memo. 1992-254, 63 T.C.M. (CCH) 2911, 2913 (holding that the taxpayer received a distribution of partnership assets when he withdrew cash from the partnership, despite claiming that his withdrawals were loans from the partnership).  To satisfy this requirement, the capital accounts of the partners first must be adjusted to reflect how any unrealized[52] income, gain, loss, and deduction inherent in the property (not already reflected in the capital accounts) would be allocated among the partners if there were a taxable disposition of the property for its fair market value (colloquially referred to as a "book-up").  Treas. Reg. § 1.704-1(b)(2)(iv)(*e*)(*1*).

---

[51] "Liquidation" includes both the liquidation of the partnership and the liquidation of the partner's interest.  Treas. Reg. § 1.704-1(b)(2)(ii)(*g*).

[52] Gain is defined as the excess of the amount realized from a sale or other disposition of property over the taxpayer's adjusted basis in the property.  § 1001(a).  An amount realized is the sum of money or fair market value of property received from the sale or other disposition of the property.  § 1001(b).  "Realization" of these amounts typically occurs when the transferor is in receipt of cash or property, but realization may also occur when the last step is taken by the transferor by which he obtains the fruition of the economic gain which has already accrued to him.  *Helvering v. Horst*, 311 U.S. 112, 115 (1940).  A taxpayer's basis in an asset is generally its cost of acquiring the property.  § 1012.  The basis of property contributed to a partnership by a partner is the adjusted basis of the property to the contributing partner at the time of the contribution (adjusted for any gain recognized by the contributing partner).  § 723.  In the case of intangible assets, basis includes amounts that are required to be capitalized, such as amounts paid to create or enhance an intangible asset.  Treas. Reg. § 1.263(a)-4(b)(1), (g)(1).  "Unrealized gain", therefore, refers to the excess of the fair market value of property over its basis (i.e., its appreciation in value) at a point before a realization event (before it is disposed of).  *See, e.g.*, Treas. Reg. § 1.704-1(b)(5) (example 14).

**[\*35]** The fair market value assigned to property contributed to, distributed by, or otherwise revalued by a partnership will be regarded as correct, provided that (1) the value is reasonably agreed to among the partners in arm's-length negotiations and (2) the partners have sufficiently adverse interests. Treas. Reg. § 1.704-1(b)(2)(iv)(*h*)(*1*). The determination of fair market value is a question of fact. *S. Tulsa Pathology Lab'y, Inc. v. Commissioner*, 118 T.C. 84, 101 (2002).

We address in Part II.A–C the parties' contentions as to the existence of "client-based intangibles", the presence of "unrealized gain" inherent in those intangibles, and the corresponding "book-up" of the partners' capital accounts.

II.   *Analysis*

A.   *Distribution of client-based intangibles to Newman PLLC and Town PS in 2013*

The FPAA determined that CRC's reported "client distributions" were not distributions and should be disregarded. In the alternative, the IRS determined that the "client distributions" had not been substantiated as to the clients distributed, their overall value, or CRC's ability to value each client distributed. In response, petitioner argues that "goodwill" is an asset of CRC and that when Newman PLLC and Town PS "took clients from CRC", they effected a distribution of goodwill from CRC to each of them. CRC aptly cites *Rudd v. Commissioner*, 79 T.C. 225, 238 (1982), in which we stated:

> The goodwill of a public accounting firm can generally be described as the intangibles that attract new clients and induce existing clients to continue using the firm. These intangibles may include an established firm name, a general or specific location of the firm, client files and workpapers (including correspondence, audit information, financial statements, tax returns, etc.), a reputation for general or specialized services, an ongoing working relationship between the firm's personnel and clients, or accounting, auditing, and tax systems used by the firm.

The client-based component of such generalized "goodwill" is the asset at issue here.

**[\*36]** To further support its argument that goodwill was a partnership asset, petitioner alleges that "[t]he partners agreed to transfer their goodwill to CRC as part of a deal in which they received their interest in the partnership and specifically, they received an AAV deferred compensation balance." The Commissioner rebuts this argument by pointing to a lack of evidence that the partners contributed any intangible assets *to the partnership*[53] and by arguing that CRC could not "distribute" goodwill to Newman PLLC and Town PS when clients decided (of their own free will) to cease engaging CRC and instead retain the services of NT PLLC.

Taking into consideration the terminology used in the FPAA (i.e., "client distribution"), it is clear to us that, although both parties intermittently refer to a contribution to and distribution of general "goodwill" from CRC, at issue in this case is a distribution of CRC's clients or a client list in particular, both of which we refer to as the "client-based intangibles". Client lists and other client-based intangibles have value. *See, e.g.*, *Newark Morning Ledger Co.*, 507 U.S. at 570; *Holden Fuel Oil Co.*, 31 T.C.M. (CCH) at 187–89. This value can exist even where the client is not contractually bound to keep bringing his business. *See Aitken v. Commissioner*, 35 T.C. 227, 230–31 (1960) (holding that insurance contract "expirations", which did not guarantee renewal of an insurance contract, but contained client and policy information and were analogous to customer lists, goodwill, or just intangibles in the nature of goodwill, constituted valuable capital assets capable of transfer); *see also Holden*, 31 T.C.M. at 184–85, 187 ("[Although] customers [on a customer list] were not obligated to purchase fuel oil from [the taxpayer] . . . [i]n acquiring the list [the taxpayer] was afforded the opportunity of contacting persons who were known to be using fuel oil to heat their homes and who were in the need of a new supplier; clearly providing [the taxpayer] with a valuable asset."). Business entities, such as limited liability companies, may own and distribute such intangible assets. *See, e.g.*, *JHK Enters., Inc.*, 8 T.C.M. (CCH) at 1032. CRC could therefore hold and distribute such assets, and although the evidence does not support that Newman PLLC and Town PS either contributed client-based intangibles to CRC or

---

[53] We take as true the Commissioner's point that Town PS did not contribute an intangible *to the partnership* because Town PS in fact bought its interest in CRC not by direct contribution to CRC but rather by purchasing it from Clark PLLC (at a discount that Clark PLLC allowed in view of the value of Town PS's book of business). However, this fact does not at all undermine the fact (which we have found) that Town PS required and Clark PLLC gave compensation for the value of Town PS's book of business.

**[\*37]** transferred client-based intangibles in exchange for their AAV account, the evidence does support CRC's ownership of client-based intangible assets capable of valuation and distribution.

CRC's dealings demonstrate that it and its partners understood that a partner's "book of business" consisting of current clients would be valued upon entry of a partner and charged for upon withdrawal. For example, when Benbow PS withdrew from CRC, its capital account was reduced to zero to reflect the distribution of CRC clients to Benbow PS. Similarly, when Town PS joined CRC as a partner, Clark PLLC and Town PS calculated the price that Town PS would pay to Clark PLLC for 25% of its interest in CRC by adding up the values of CRC's assets, multiplying the total by 25% (the amount of Town PS's anticipated partnership interest) and then subtracting from that total an amount (i.e., $234,046) that was equal to the prior year's revenue generated from Mr. Town's "book of business". The record also contains an exhibit entitled "John's Buy-in Calculation" relating to the price for Town PS's purchase of a 25% partnership interest from Clark PLLC. This document was contemporaneously used to determine the purchase price of Town PS's partnership interest in CRC, and it reflects the same purchase price discount with the label "[a]greed upon value of John's book brought in".

The 2013 LLC Agreement's distribution provisions likewise treat clients as a valuable partnership asset. Section 9.3(b) of the 2013 LLC Agreement (like Section 9.3(b) of the 2012 LLC Agreement and Section 8.3(b) of the 2009 LLC Agreement) states that "[i]f any Clients are Distributed . . . the value of such Client shall be the Client Value", defined as gross revenue invoiced to the client over the prior 12 months. Although the 2013 LLC Agreement as executed in 2012 and reaffirmed in 2013 lacks the express client distribution provision of Section 11.1(a)(i) of the 2009 LLC Agreement, the partners agreed to Section 9.3(b) when they executed the 2013 LLC Agreement, and neither party argues we should disregard their agreement to this effect. In some cases, we might ignore an agreed-upon valuation method where there was evidence of collusion between the partners; but here the partners' interests were adverse at the time they agreed to the 2013 LLC Agreement. Plainly, the partners were negotiating at arm's length the terms of Clark PLLC's buyout.

Consequently, we hold that CRC's method for valuing client-based intangibles upon the withdrawal of Newman PLLC and Town PS comports with the fair market value definition of Treasury Regulation

**[\*38]** section 1.704-1(b)(2)(iv)(*h*)(*1*). In the absence of any competing valuation presented by the Commissioner, or any critique of this valuation, we accept it as correct.

As is stated above, under the terms of the 2013 LLC Agreement, the "Client Value" of the clients that retained NT PLLC was $742,569, of which $318,144 was allocable to Newman PLLC and $424,425 was allocable to Town PS. We therefore hold that petitioner has met its burden to prove that there was a distribution of clients, and that, on the evidence before us,[54] CRC did in fact distribute client-based intangible assets of $318,144 to Newman PLLC and $424,425 to Town PS when certain clients left CRC and engaged NT PLLC following Newman PLLC's and Town PS's withdrawals.

Obviously, this was not a textbook instance of a partnership distribution, labeled as such by agreement of the parties when the partner withdrew. Rather, CRC initially contended that the taking of property (i.e., the clients) was wrongful and was a breach of the 2013 LLC Agreement. We can imagine a circumstance in which a partner's taking of property from a partnership was outright robbery; and in such a circumstance it might be treated for tax purposes not as a distribution but as a theft, perhaps deductible on the partnership return as a theft loss under section 165(e) and includible as ordinary income to the partner. *See James v. United States*, 366 U.S. 213, 219 (1961). But here the partners and the partnership had a disagreement about the entitlement to the property, and before the end of the tax year, they agreed to a settlement of their dispute under which the partners would be entitled to keep the property they had taken. We conclude we should accept their agreed-upon resolution of the dispute and should apply the provisions of the Code pertinent to that characterization. Neither party to this case argues that it should instead be treated as a theft. The ultimately agreed-upon transfer of the client-based intangibles is best understood as a distribution.

The Commissioner argues, in effect, that the transfer of the client-based intangibles should be ignored as non-factual, because (he says) the intangibles did not exist and were not transferred. For the reasons

---

[54] We do not hold that client-based intangibles always exist in a partnership, nor that they always have value, nor that a withdrawing partner who thereafter serves former clients of the partnership always receives a distribution from the partnership. But we conclude that, in this case, the evidence warrants those holdings.

**[\*39]** stated above, we reject that approach. The Commissioner also presents an alternative argument:

> Having structured the economic deal that goodwill was not a partnership asset, petitioner is bound by the treatment the parties negotiated. A taxpayer, although free to structure his transaction as he chooses, "once having done so, he must accept the consequences of his choice, whether contemplated or not . . . and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Comm'r v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) (citations omitted). To disavow the LLC Agreement's treatment of goodwill, petitioner must present strong proof that the LLC Agreement was wrong.

But the partners of CRC did not negotiate a deal that clients were not a value that could be brought into the firm and taken out of it. Rather, the partners took into account an entering partner's book of business in determining on what terms the partner would enter the partnership; and Section 5.1 of the 2013 LLC Agreement acknowledges that CRC "expended substantial time and funds in developing . . . the Company's clientele and their patronage"; Section 1.6 postulates a "goodwill value of the Company" (used for calculating AAV rights); and it expressly makes provision (in Section 9.3(b)) for "Clients [to be] Distributed under this Agreement" and (in Section 1.19) for the "Client Value" to be determined. When Newman PLLC and Town PS did withdraw, they took clients with them, and the parties executed an "Agreement Regarding Client File Transfer Procedure".

It is true that the 2013 LLC Agreement does not make express provision for goodwill to be contributed by a partner and included in his capital account, but that silence does not amount to an agreement that client-based intangibles do not exist and cannot be transferred. It is also true that CRC failed to reflect intangible values in partners' capital accounts (and that is part of the reason that we hold below that CRC's special allocation fails the tests for economic effect, *see infra* Part II.B); but a partnership's failure to reflect an asset on its books does not make the asset cease to exist. If a partnership fails to book its cash (to choose an extreme instance), a distribution of that unbooked cash is still a distribution. Treating the distribution of the client-based intangibles as a distribution does not (in the words of the Commissioner's brief quoted above) require "disavow[ing]" the LLC Agreement's treatment of

**[\*40]** goodwill". Rather, it requires invoking and giving effect to the express terms of Section 9.3(b).

B. *Lack of substantial economic effect in 2013 income allocations*

Having held that CRC distributed client-based intangible assets to Newman PLLC and Town PS upon their withdrawal as partners, we now turn to CRC's allocation of income to Newman PLLC and Town PS, which the IRS determined did not have substantial economic effect.

Petitioner argues that Newman PLLC's and Town PS's capital accounts, which had initial balances of $34,972 and $96,638 respectively, were driven negative by subtracting the value of the clients distributed to them. These negative capital account balances "triggered" the QIO provision of the 2013 LLC Agreement and required that CRC allocate income to Newman PLLC and Town PS in 2013 in amounts sufficient to restore their capital account balances to zero. CRC argues that its income allocations have substantial economic effect because they are consistent with the economic arrangement of the partners in the 2013 LLC Agreement.

We first examine whether the income allocation at issue satisfies any of the tests under Treasury Regulation section 1.704-1(b)(2)(ii), so that it is deemed to have economic effect.

1. *The allocation fails the basic test.*

The basic test for economic effect requires (in part) that the partnership agreement contain a deficit restoration obligation. The 2013 LLC Agreement contains no such provision and in fact explicitly states that "this Agreement shall *not* be construed as creating a deficit restoration obligation or otherwise personally obligating any Member to make a capital contribution in excess of those required by [a section detailing initial and additional capital contributions]." (Emphasis added.) Without a deficit restoration obligation in the 2013 LLC Agreement, the special allocation cannot satisfy the basic test for economic effect. *See* Treas. Reg. § 1.704-1(b)(2)(ii)(*b*).

2. *The allocation meets the criteria of the alternate test but does not have economic effect.*

The alternate test requires that the partnership agreement provide: (1) for the determination and maintenance of partners' capital

**[*41]** accounts in accordance with Treasury Regulation section 1.704-1(b)(2)(iv); (2) that upon liquidation of the partnership, the proceeds of liquidation be distributed in accordance with the partners' positive capital account balances; (3) that capital accounts be reduced for any allocation of loss or deduction or distributions that, as of the end of the year, are reasonably expected to be made, to the extent that such allocations or distributions exceed reasonably expected increases to the partners' capital account; and (4) for a QIO provision. Treas. Reg. § 1.704-1(b)(2)(ii)(*d*).

The 2013 LLC Agreement does contain provisions that (1) require maintenance of capital accounts in accordance with Treasury Regulation section 1.704-1(b)(2)(iv), (2) require liquidation distributions in accordance with partners' positive capital account balances, (3) require reductions for reasonably expected allocations or distributions, and (4) implement a QIO. However, the special allocation of income cannot have economic effect because, as we explain below, CRC did not actually maintain the capital accounts of its partners in accordance with the 2013 LLC Agreement and Treasury Regulation section 1.704-1(b)(2)(iv) ("[A]n allocation of income, gain, loss, or deduction will not have economic effect . . . unless the capital accounts of the partners are *determined and maintained* throughout the full term of the partnership in accordance with the capital accounting rules" (emphasis added)).

The Commissioner asserts persuasively that CRC failed to maintain capital accounts in accordance with Treasury Regulation section 1.704-1(b)(2)(iv) because, before distributing those assets, CRC did not increase the partners' capital accounts by the value of the unrealized gain[55] inherent in the client-based intangible assets. *See* Treas. Reg. § 1.704-1(b)(2)(iv)(*e*)(*1*). In response, petitioner argues that the client-based intangibles did not have unrealized gain because the partners transferred their "goodwill" (at fair market value) to CRC in exchange for their AAV account balances, such that the value of that goodwill resided in the AAV account. Petitioner further argues that the partners' AAV accounts control the allocation of any taxable gain on the sale of the client-based intangibles and that, in effect, "[section] 704 and its regulations do not apply because [the section] 704 book-up only

---

[55] *See supra* note 52. With his assertion, the Commissioner necessarily assumes that a client-based intangible asset may indeed bear unrealized gain, and we therefore adopt his assumption.

**[\*42]** applies to capital accounts and not AAV accounts (which are deferred compensation liability accounts)."

As we have discussed, petitioner has not shown that the partners ever actually contributed "goodwill" or client-based intangibles to CRC[56] (or exchanged client-based intangibles for an AAV account), or, if such a contribution (or exchange) did occur, the value of the assets at that time. Neither does it cite any authority (controlling or otherwise) to support its position regarding the AAV accounts and the inapplicability of section 704(b), so we cannot accept its position. Indeed, AAV accounts (used here by CRC as a method of calculating deferred compensation payable to retiring partners) are not capital accounts, and we are unaware of any authority relieving CRC from its capital account maintenance responsibilities simply because it used such a mechanism. We must therefore examine whether the client-based intangible assets that Town PS and Newman PLLC received contained unrealized gain, and if so, whether CRC failed to increase the partners' capital accounts by such unrealized gain before the distribution to Newman PLLC and Town PS.

The FPAA determined that the income allocation lacked substantial economic effect, and so the burden is on Clark PLLC, as petitioner, to prove that such allocation did have substantial economic effect. It necessarily follows that, under an analysis of the economic effect of the income allocation, one element of petitioner's burden is to prove that CRC maintained capital accounts in accordance with Treasury Regulation section 1.704-1(b)(2)(iv). This burden includes

---

[56] As we have mentioned, Clark PLLC discounted the purchase price of Town PS's partnership interest for the "[a]greed upon value of John's book brought in". This discount by itself is insufficient to establish that Town PS contributed its "book of business" or "clients" *to CRC* because Town PS did not make a capital contribution to CRC to acquire its partnership interest; rather, it purchased its interest from Clark PLLC. We interpret the discount as the value that Clark PLLC (the seller in that transaction) must have placed on the future benefit it would realize from its distributive share of income generated by Town PS's book of business, and not as an indication that Town PS was somehow contributing its clients to CRC. Our interpretation is further supported by the fact that CRC credited Town PS's capital account with an initial balance equal to the *discounted purchase price* of its partnership interest (i.e., Town PS's initial capital account balance was not increased for contribution of a "book of business", *see* Treas. Reg. § 1.704-1(b)(2)(iv)(*b*)). That is, when the discount reduced Town PS's purchase price of $872,996 by $234,046, for a final purchase price of $639,000, CRC set Town PS's initial capital account balance not at $872,996 (as if Town PS had contributed the cash and a client-based intangible) but rather at $639,000 (the amount of cash only).

**[\*43]** proving that CRC increased the capital accounts in accordance with subdivision (iv)(*e*)(*1*), or, in the alternative, proving that the client-based intangible asset lacked any unrealized gain. Petitioner does not argue that this burden should shift to the Commissioner.

To determine whether the client-based intangible asset contained unrealized gain, we must determine the partnership's adjusted basis in the asset. *See* § 1001(a). Petitioner made no showing of the cost to acquire or develop the client-based intangible assets, *see* Treas. Reg. § 1.263(a)-4(g)(1), or (tangential to its argument that partners "exchanged" or "contributed" the assets to CRC) the partners' adjusted bases in the client-based intangibles before their alleged contribution, *see* §§ 723, 732. We hold that petitioner has failed to prove CRC's adjusted basis in the client-based intangibles distributed to Newman PLLC and Town PS, and we therefore assign zero-dollar bases to these assets.[57] Accordingly, with a collective fair market value of $742,569 and a zero-dollar basis, the unrealized gain in the distributed client-based intangibles is $742,569. *See* § 1001(a).

The parties have stipulated that the partners' opening capital account balances in 2013 did not include the value of any intangibles and that CRC did not increase the partners' capital accounts by the value of any inherent gain in the client-based intangibles. Therefore, CRC failed to maintain the partners' capital accounts in accordance with Treasury Regulation section 1.704-1(b)(2)(iv),[58] and the special allocation accordingly cannot satisfy the alternate test for economic effect. The allocation will therefore be deemed to have economic effect only if it is able to satisfy the third test—the economic equivalence test.

---

[57] In the absence of proof of basis by CRC (the party with the burden of proof), we assume zero basis because that would be the finding adverse to CRC. If we found instead that the client-based intangible assets had bases equal to their fair market values at the time of transfer (despite the fact that CRC did not produce evidence to support it), the assets would not have had built-in gain that CRC would have been required to allocate among the partners' capital accounts before distribution. In such circumstance, it is possible that we would have held that CRC had maintained its capital accounts in accordance with the Treasury Regulation § 1.704-1(b)(2)(iv) and, therefore, that CRC's allocations of income had economic effect. A holding of economic effect would conflict with the IRS's determination in the FPAA that the allocations lacked substantial economic effect, and CRC has the burden to disprove that determination.

[58] The fact that the partners "agreed" to their capital account balances incident to negotiations might suggest that CRC did not strictly adhere to the capital accounting rules of Treasury Regulation § 1.704-1(b)(2)(iv). *See supra* pp. 12–13.

**[\*44]**     3.     *The allocation does not have economic equivalence.*

In some cases, despite not adhering to the formal requirements of the economic effect tests, an allocation may produce the same income tax results as if the allocation had satisfied the requirements of the basic test.  Treas. Reg. § 1.704-1(b)(2)(ii)(*i*).  Petitioner has neither argued nor demonstrated that the special allocation satisfies the economic equivalence test.[59] Therefore, the allocations have neither economic equivalence nor economic effect.

The substantial economic effect analysis under Treasury Regulation section 1.704-1(b)(2)(i) has two parts: first, the allocation must have economic effect, and second, the economic effect of the allocation must be substantial.  Because we have determined that CRC's allocations of income to Newman PLLC and Town PS do not have economic effect, we do not conduct an analysis of substantiality.[60]

C.     *Partner's interest in the partnership*

Having determined that CRC's allocations of income to Newman PLLC and Town PS lack substantial economic effect, we must redetermine the allocations in accordance with "the partners' interests in the partnership".  Treas. Reg. § 1.704-1(b)(1)(i).  In this analysis, we must determine the "manner in which the partners have agreed to share the economic benefit or burden (if any) corresponding to the income, gain, loss, deduction, or credit (or item thereof) that is allocated", taking into account all the facts and circumstances.  Treas. Reg. § 1.704-1(b)(3)(i).  To do so, the regulation calls on us to examine (1) the partners' relative contributions to the partnership, (2) the interests of the respective partners in profits and losses (if different from that in taxable income or loss), (3) their relative interests in cash flow and other non-liquidating distributions, and (4) their rights to distributions of capital

---

[59] CRC's failure to increase the capital accounts by the unrealized gain in the client-based intangibles before distribution resulted in incorrect capital account balances (before distribution) for each partner in 2013.   Therefore, its income allocations were not based on correct capital account balances and cannot have economic equivalence because the resulting amounts of income allocated per partner differ from those resulting from an application of the basic test for economic effect.

[60] The Commissioner stated that if the Court were to find economic effect, then he "does not dispute that the economic effect of the allocations was substantial."

**[\*45]** upon liquidation.[61]  Treas. Reg. § 1.704-1(b)(3)(ii).  Petitioner does not offer any argument regarding the analysis of "the partner's interest in the partnership" or the individual factors set out in the regulation.

The terms of the 2013 LLC Agreement ostensibly complied with the criteria of the alternate test for economic effect, but the special allocation lacked substantial economic effect because the partnership failed to correctly maintain capital accounts in accordance with those terms and with the regulations.[62]  We proceed with examining the relevant factors, keeping in mind that our goal is to derive the "manner in which the partners *have agreed* to share the economic benefit or burden (if any) corresponding to the income, gain, loss, deduction, or credit (or item thereof) that is allocated", Treas. Reg. § 1.704-1(b)(3)(i)

---

[61] Treasury Regulation § 1.704-1(b)(3)(iii) provides that if the first two requirements of the basic test are met (i.e., that the partnership agreement provides for (1) the determination and maintenance of the partners' capital accounts in accordance with the capital account rules and (2) liquidating distributions to be made in accordance with the positive capital account balances of the partners), then "the partners' interests in the partnership with respect to the portion of the allocation that lacks economic effect will be determined" with a comparative liquidation analysis. *See, e.g.*, *Interhotel Co. v. Commissioner*, T.C. Memo. 2001-151, 81 T.C.M. (CCH) 1804, 1809, *supplementing* T.C. Memo. 1997-449.  However, neither party argues that this comparative liquidation test should govern our analysis (in fact, the Commissioner argues explicitly that it should not apply, and CRC does not contest the Commissioner's argument), so we do not address it.

[62] In some of the cases that have employed a partner's interest in the partnership analysis, the Court has examined the actual distributions received by the partners (and other similar items) to determine the partners' interests in the partnership because the partnerships lacked written partnership agreements. *See, e.g.*, *Holdner v. Commissioner*, T.C. Memo. 2010-175, 100 T.C.M. (CCH) 108, 116–17, *aff'd*, 483 F. App'x 383 (9th Cir. 2012); *Estate of Ballantyne v. Commissioner*, T.C. Memo. 2002-160, 83 T.C.M. (CCH) 1896, 1904–06, *aff'd*, 341 F.3d 802 (8th Cir. 2003). In other cases the partnership agreement lacked the provisions for capital account maintenance or distributions in liquidation of the partnership under Treasury Regulation § 1.704-1(b)(2)(ii)(b)(1) and (2), or the allocations prescribed by the partnership agreement lacked substantial economic effect, and so the Court relied heavily on the history of the partners' relative contributions (or the impact of the partners' relative contributions on prospective liquidating distributions) to determine the partners' interests in the partnership. *See, e.g.*, *Estate of Tobias v. Commissioner*, T.C. Memo. 2001-37, 81 T.C.M. (CCH) 1163, 1169–71; *PNRC Ltd. P'ship v. Commissioner*, T.C. Memo. 1993-335, 66 T.C.M. (CCH) 265, 268, 270.  In this case, however, the partnership did have a written partnership agreement, and that written agreement did have provisions of the sort that, in other cases, were lacking and had to be inferred or hypothesized.

**[\*46]** (emphasis added), and that the 2013 LLC Agreement is evidence of such agreement.

1.    *The partners' relative contributions to the partnership*

The record is insufficient to chronicle the entire history of the partners' contributions to CRC, and so we are unable to conduct a complete evaluation of their relative contributions.[63] Town PS purchased its interest in CRC from Clark PLLC for $639,000 in 2009 and contributed $10,000 in 2012, and Newman PLLC contributed $200,000 in 2012, but we are lacking information regarding Clark PLLC's contributions. Although we lack sufficient information to calculate overall contributions, the economic reality evidenced by the partners' relative ownership of membership "units" in CRC is that Clark PLLC owned the largest percentage and therefore likely made the largest "contribution" of his business.[64] Consistent with this economic reality, the Commissioner reckons Clark PLLC's "Percentage of total capital accounts" as 69%, but he "provide[s] more weight to the other factors". As a proxy for partners' contributions, he uses partners' account balances, but this may understate Clark PLLC's dominance.

---

[63] The Commissioner proposes that the partners' capital contributions are equal to each partner's 2012 capital account balance, following Newman PLLC's capital contribution of $200,000, but he offers no explanation in support of that suggestion. We cannot understand the Commissioner's reasoning in suggesting these balances to represent the parties' capital contributions and therefore do not accept his proposal. While capital accounts are generally intended to represent a snapshot of the partners' equity in the partnership (adjusted to reflect the operations of the partnership), *Interhotel*, 81 T.C.M. (CCH) at 1807, an analysis of the partners' capital contributions for the purpose of the partner's interest in the partnership analysis involves a comparison of the partners' historical contributions, *see, e.g.*, *PNRC Ltd. P'ship*, 66 T.C.M. (CCH) at 270. By using a snapshot of the partners' capital account balances instead of a historical record of the partners' contributions, the Commissioner supplants actual contributions by the parties with a value that may reflect contributions but may also reflect various distributions and other adjustments throughout the operation of the partnership; therefore, he fails to analyze the correct criterion for this step of the analysis.

[64] *See supra* pp. 15–16. Clark PLLC's initial contribution consisted of "[f]ormation costs, contribution of property from predecessor Company, and buy-out of former Members (including inventory, business assets and equipment, goodwill and all other tangible and intangible property) and other amounts shown on the books of the Company", and Newman PLLC's and Town PS's initial capital contributions (beyond the $200,000 in cash contributed by Newman PLLC) were said to consist of "amounts as shown on the books of the Company".

**[*47]**   2.   *The interests of the partners in economic profits and losses*

The 2013 LLC Agreement clearly enumerates the criteria for allocating income to each of the partners, and we follow the 2013 LLC Agreement to make our analysis.[65]

The 2013 LLC Agreement allocates income according to a three-step formula.  The first step (in Section 8.1(a)) allocates income equal to 10% of the "Tangible Net Worth" reflected in each partner's capital account balance to the respective partner.  On the basis of the 2013 LLC Agreement's definition of "Tangible Net Worth" and the partnership's notable exclusion of intangible assets from the partners' capital accounts, we understand this first step to allocate an amount of income to each partner equal to 10% of such partner's positive capital account balance.  The second step (in Section 8.1(b)) then allocates income to Clark PLLC for amounts collected on accounts receivable (which the parties have stipulated was $15,387 in 2013).  Third, Section 8.1(c) allocates the remaining income according to the FMG system, which the parties have stipulated should be allocated fully to Clark PLLC for 2013.

The first step in the formula under Section 8.1 allocates a portion of income to the partners' capital accounts in accordance with their positive capital account balances.  Therefore, an income allocation analysis necessarily begins with the capital accounts balances of the partners, as adjusted for allocations, distributions, and other adjustments as stipulated by the parties and as we have held in this Opinion (in some respects different from the Commissioner's contentions, as we will discuss).  We outline the necessary adjustments to the capital accounts below.

---

[65] The 2013 LLC Agreement's income allocation provisions are not the reason that the CRC's special allocation of clients to Newman PLLC and Town PS lacked substantial economic effect (rather, the reason was CRC's failure to maintain capital accounts in accordance with the regulations).

[*48] CRC reported (and the Commissioner does not contest) that the partners had the following beginning capital account balances in 2013:

| Partner | Capital account balance |
|---------|-------------------------|
| Clark PLLC | $1,131,549 |
| Newman PLLC | 34,972 |
| Town PS | 96,638 |

CRC did not allocate the unrealized gain inherent in the client-based intangible to the partners' capital accounts before the decrease corresponding with the distribution. We have held that the client-based intangible held unrealized gain, and therefore, such gain must be allocated to the partners' capital accounts before the distribution of the client-based intangibles. The 2013 LLC Agreement states that "all items of Company . . . gain . . . shall be divided among the Members in the same proportions as they share Net Profits or Net Losses". Therefore, the allocation of unrealized gain realized on the hypothetical sale of the client-based intangibles follows the same tiered formula governing income allocations, discussed above.

Following the allocation of unrealized gain, Newman PLLC's and Town PS's capital accounts must be decreased by the value of the client-based intangibles distributed to them. *See* Treas. Reg. § 1.704-1(b)(2)(iv)(*b*). The partners' capital accounts must also be decreased by the distributions of cash to each partner, and Newman PLLC's capital account must be decreased by the value of the distribution to it on account of the WTB Loan.

Section 8.1 of the 2013 LLC Agreement, "Allocation of Net Profit or Loss", allocates income according to the formula above, but "subject to Section[] 8.3". Section 8.3 of the 2013 LLC Agreement includes (among other provisions that are inapplicable here) the QIO provision. Therefore, all income allocations under Section 8.1 are subject, first, to the QIO, which requires that, if any partner unexpectedly receives an adjustment (i.e., following an unexpected distribution) that results in a deficit capital account balance for that partner, items of income and gain must be allocated to that partner to rectify the deficit capital account balance as quickly as possible.

**[\*49]** According to our calculations, the various adjustments discussed above result in deficit capital account balances for both Newman PLLC and Town PS at the end of 2013. Therefore, under the terms of the 2013 LLC Agreement, the triggered QIO provision allocates income to each of them in an amount necessary to bring their capital account balances up to zero.[66]

Therefore, we hold that, for the purposes of this factor of the partner's interest in the partnership analysis, the partners agreed to allocate income from the 2013 taxable year to Newman PLLC and Town PS in amounts (yet to be precisely determined) sufficient to increase their capital account balances to zero.

We note that the Commissioner calculates the partnership's allocation of income using a similar method, but he fails to adjust the partners' capital accounts by the various adjustments throughout the year, in particular: (1) the allocation of unrealized gain; (2) the distributions of client-based intangible assets to Newman PLLC and Town PS; and (3) the property distribution to Newman PLLC on account of the outstanding balance of the WTB Loan.[67] He then calculates the

---

[66] The parties disagree about whether the $200,000 payment made by Newman PLLC and Town PS (in proportions that the record does not show) incident to the Settlement Agreement constitutes a "capital contribution" by either of them for federal tax purposes. However, because of the stipulated value of the client-based intangibles that we hold to have been distributed, and the corresponding decrease to the partners' capital accounts as a result, Newman PLLC's and Town PS's capital accounts will be deficit in amounts greater than CRC's total ordinary income in 2013—whether or not the $200,000 payment was a "capital contribution" (i.e., whether their respective capital accounts were increased by some portion of that payment).

[67] In analyzing in his brief the interests of the partners in gains and losses, the Commissioner excludes the impact of the distribution on account of the WTB Loan because he takes issue with CRC's allocations of income in 2012 (i.e., not the year at issue). In 2012 CRC had allocated a loss of −$3,118 to Newman PLLC, *see supra* note 37, which Newman PLLC contested in a Form 8082, *see supra* note 41, reporting instead an income allocation of $167,872. The Commissioner contends that CRC's allocation of a loss to Newman PLLC was improper, and that instead CRC should have allocated to Newman PLLC income of $167,872. This allocation of income, the Commissioner contends, if taken into consideration in the calculation of the partners' capital accounts, would sufficiently offset any decrease in Newman PLLC's capital account caused by the property distribution on account of the WTB Loan. He asks us to "consider facts in the record regarding the 2012 transactions as it relates to the 2013 year at issue", and effectively to determine the validity of CRC's 2012 allocations of income. Even assuming that we would otherwise have jurisdiction to make such a determination, the issue is not properly before us: The issue is not stated in the FPAA

**[\*50]** allocations of income using the formula in the 2013 LLC Agreement on the basis of the partners' initial capital account balances in 2013 but concludes that 100% of income should be allocated to Clark PLLC because "all the benefit of CRC's 2013 business operations inured to Clark PLLC". While it is true that Clark PLLC received the largest cash distribution in 2013, the Commissioner omits from his calculation the impact of the client-based intangible distribution, and he therefore disregards the implication of the partners' negative account balances, the effect of the QIO, and the income properly allocable to Newman PLLC and Town PS as a result.

### 3. *The interests of the partners in cash flow and other non-liquidating distributions*

The 2013 LLC Agreement states that distributions of "[c]ash may be made to the Members at such time and amounts as determined in the Managers' reasonable discretion, provided that such [d]istributions will be consistent with the allocations of income made pursuant to Section 8.1".

The Commissioner argues that we should look to the cash distributions actually received by the partners in 2013 (instead of looking to the 2013 LLC Agreement) to determine the parties' agreement as to cash and non-liquidating distributions. He cites *Estate of Tobias*, 81 T.C.M. (CCH) at 1163, and *Interhotel Co.*, 81 T.C.M. (CCH) at 1804, to argue that the economic burden (i.e., the tax burden) should follow the economic benefit received by the partners. He argues that Clark PLLC's receipt of the largest portion ($632,201) of total cash distributions ($660,889) is evidence of the partners' agreement as to how they would share the economic benefit of CRC's income in 2013.

However, the facts of this case distinguish it substantially from those of *Interhotel* and *Estate of Tobias*. Notably, the partnership

---

on which this case is founded; the Commissioner did not plead the issue in his answer (where it would have constituted "new matter" under Rule 142(a)(1); and the parties, in their jointly submitted motion to submit the case pursuant to Rule 122, agreed that the remaining legal issues in dispute are limited to the distribution of the client-based intangibles and the substantial economic effect of CRC's income allocations in 2013. *See supra* note 44. Therefore, we do not address the Commissioner's contentions regarding CRC's 2012 allocations of income.

[*51] agreements at issue in *Interhotel* did not include QIOs[68] (or, as far as we can tell, the requirement that distributions follow allocations of income), and the partnership in *Estate of Tobias* lacked a written partnership agreement entirely.[69] Here, CRC has a partnership agreement negotiated by the partners at arm's length, and neither party presents a reason why we should disregard its provisions. Therefore, on the basis of the provisions of the 2013 LLC Agreement, we hold that the partners, for the purpose of this factor of the partner's-interest-in-the-partnership analysis, agreed to make cash and other non-liquidating distributions in amounts equal to the income allocations for the 2013 year.

### 4. *The rights of the partners to distributions of capital upon liquidation*

The 2013 LLC Agreement states that, upon liquidation of the partnership, assets will be distributed "[t]o the Members in repayment of the positive balances of their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year during which the liquidation occurs". Upon a partner's voluntary withdrawal (i.e., a liquidation of that partner's interest), a partner is entitled to a distribution amount equal to its capital account balance.[70]

On the basis of our calculations above, Clark PLLC is the only partner that ends 2013 with a positive capital account balance after adjustments. Therefore, under the provisions of the 2013 LLC Agreement, if CRC liquidated at the end of 2013, Clark PLLC would

---

[68] "[N]either the [taxpayer's] Original Agreement nor the [taxpayer's] Restated Agreement contain[ed] a provision requiring capital account adjustments for reasonably expected distributions or a 'qualified income offset'." *Interhotel*, 81 T.C.M. (CCH) at 1808.

[69] "[The partners] did not enter into a written partnership agreement and . . . their oral agreement was merely an informal, general agreement to operate an animal farm and did not contain any specific terms." *Estate of Tobias*, 81 T.C.M. (CCH) at 1169.

[70] We recognize that whether Town PS is entitled to a distribution of its capital account balance upon voluntary withdrawal under the 2013 LLC Agreement depends on some combination of factors (including its capital account balance and/or payment in full of the loan owed to Clark PLLC). *See supra* pp. 16–17. However, we are unable to determine from the 2013 LLC Agreement the exact criteria of this limitation or the outstanding balance on the loan to Clark PLLC from the record. Therefore, we do not consider this limitation in our analysis.

**[*52]** receive the partnership's assets in total. Similarly, given Newman PLLC's and Town PS's negative capital account balances, neither partner was likely entitled to a distribution on account of its capital account balance. In support of this outcome, the Commissioner argues that the terms of the parties' Civil Rule 2A Agreement (wherein Newman PLLC and Town PS agreed to make further contributions, and which did not provide that either was entitled to a liquidating distribution), and the fact that Newman PLLC and Town PS did not receive distributions equal to their capital account balances upon their withdrawal, are evidence that Newman PLLC's and Town PS's rights upon liquidation were zero, and that all income should be allocated to Clark PLLC.

This outcome generally comports with the observation that we made in our contribution analysis: that Clark PLLC owned the largest portion of CRC. Therefore, it makes intuitive sense that, in a liquidation of CRC, Clark PLLC would receive the largest portion of distributions. However, given that the allocation at issue is an allocation of annual income (not in liquidation of the partnership), we believe that the partners' agreement as to how to allocate that income, in particular the provisions regarding the QIO, are the most indicative of how the partners agreed to share the economic benefits and burdens of the partnership. We therefore afford this liquidation factor the least weight in our consideration of the partner's interest in the partnership.

> D. *"Align[ing]" distribution and income allocation in the "book-up"*

The Commissioner has another argument to resist the allocation of income away from Clark PLLC and toward the other two partners. He contends:

> Section 9.3 [of the 2013 LLC Agreement], when read in conjunction with . . . section 9.1 requires a matching of the book-up and the distribution. Because section 9.3(a) requires that non-cash distributions reflect how the cash proceeds from the sale of such property would have been distributed, it follows that the book-up must be allocated to the distributee[s] – had the property been sold first, with the proceeds distributed to Newman PLLC and Town PS, the matching rule of section 9.1 would have required the gain from the hypothetical sale to be allocated in a manner that is consistent with that cash distribution from a

**[*53]** hypothetical sale. . . .  If CRC would have distributed the cash proceeds from a hypothetical sale of $419,043 and $447,437, to Newman PLLC and Town PS, respectively, then it follows that the book-up would have been allocated in these same amounts to the distributee partners, resulting in a wash to their capital accounts.

Assuming his premises, the Commissioner is partly right:  He is right that, if the unrealized gain is allocated only to the distributee partners (Newman PLLC and Town PS) and not to Clark PLLC, then that gain allocation would increase their capital accounts, and the immediately subsequent distribution would reduce their capital accounts, and the net effect would be "a wash".  Their accounts would not be driven into negative status; the QIO would not be triggered; and CRC's 2013 income would not be allocated to those partners.

But we disagree with the Commissioner's insistence that a "matching" is required and that the unrealized gain is allocated solely to the distributee partners.  The 2013 LLC Agreement explicitly says otherwise.  Section 9.3(a) requires that, before the distribution, unrealized gain must be allocated among the partners not in accordance with their being distributees of the gain but rather "in accordance with Article 8" (i.e., in accordance with their allocations of "Net Profit or Net Loss for [the] fiscal year of the Company").  The LLC agreement could hardly be clearer.  The allocation of gain, made before any distribution has occurred, is in accordance with Article 8.

Less clear is how to reconcile the 2013 LLC Agreement with the distribution of client-based intangible assets to only two of the partners.  Section 9.3(a) states that "[n]oncash assets . . . shall be distributed in a manner that reflects how cash proceeds from the sale of such assets for fair market value would have been distributed"; and Section 9.1 states that "Distributions of Distributable Cash may be made to the Members as such time and amounts as determined in the Managers' reasonable discretion, provided that such Distributions will be consistent with the allocations of income made pursuant to Section 8.1".  Section 9.1 thus does state that the distributions "will be consistent with" the provisions of Section 8.1 (providing for allocations of net profit or loss); but Section 9.1 commits the matter to managerial discretion, so opinions might differ about the propriety of the client distribution under the 2013 LLC Agreement.

**[\*54]** However, we are adjudicating a dispute about the tax consequences of a distribution that was in fact made; we are not adjudicating a dispute about a partner's claim that he was wrongly left out of a distribution. Either dispute is resolved by the Settlement Agreement, which compromised the parties' disagreements about the withdrawal of Newman PLLC and Town PS from CRC and left the client-based intangibles in the hands of the withdrawing partners. The Commissioner is certainly right to begin his analysis with the text of Sections 8.1, 9.1, and 9.3 of the 2013 LLC Agreement, but ending there without resort to the Settlement Agreement makes the puzzle seem more difficult than it actually is. We construe the 2013 LLC Agreement in light of the later Settlement Agreement, which superseded the LLC agreement.

We conclude that the unrealized gain is properly allocated among all three partners (as set out in Section 8.1) so that the capital accounts of all three are increased, but we conclude that because the agreed-upon distribution was made only to the withdrawing partners, only their capital accounts are reduced. Consequently, the withdrawing partners' capital accounts did go negative, the QIO was triggered, and considering our analysis of the partners' interests in the partnership (and weighing most heavily the partners' agreement regarding their interests in economic profits and losses), CRC's 2013 income should be allocated to the withdrawing partners' accounts to bring them up to zero.[71]

We will order the parties to submit computations under Rule 155 to determine the exact amount of Newman PLLC's and Town PS's capital account balance deficiencies (after applicable adjustments to their capital accounts) and the amounts of income allocable to the partners' capital accounts as a result. Those computations should account for the following capital account adjustments, beginning with

---

[71] The Commissioner contends that all of CRC's ordinary income for the period of January 2013 to April 2013 is properly allocable to Clark PLLC under Section 8.1(c), which allocates all income remaining after the allocations of Section 8.1(a) and (b) according to the FMG system. The parties have stipulated that $15,387 of income is allocable to Clark PLLC under Section 8.1(b) (for amounts collected on accounts receivable) and that all remaining income is allocable to Clark PLLC under Section 8.1(c), but our analysis does not reach Section 8.1(a)–(c) of the 2013 LLC Agreement, and therefore the parties' stipulations regarding these allocations of income are not helpful in this regard. Instead, the introductory text of Section 8.1 subjects the partnership's income allocations to Section 8.3 (regarding special allocations), and therefore, due to the deficit capital account balances of Newman PLLC and Town PS, the QIO provision under Section 8.3 controls the allocation of CRC's entire amount of income for 2013.

[*55] the partners' reported opening capital account balances in 2013, *see supra* p. 24: (1) the allocation of $742,569 of unrealized gain (in the client-based intangible assets) according to Section 8.1 of the 2013 LLC Agreement; (2) the distribution of client-based intangible assets of $318,144 to Newman PLLC and $424,425 to Town PS; (3) the distribution on account of the WTB Loan of $183,737, *see supra* note 3; and (4) the cash distributions to the partners in the amounts stipulated by the parties, *see supra* note 3. By our preliminary calculations, the amount of CRC's income in 2013 is insufficient to bring both Newman PLLC's and Town PS's capital accounts up to zero. Therefore, the income must be allocated between them in some proportion. In the absence of contentions by the parties as to how to divide the total amount of ordinary income, we hold that CRC's income should be allocated to each partner's deficit capital account in an amount equal to that partner's pro rata "share" of the total negative balances of those accounts, calculated by dividing the deficit balance of each partner's capital account by the combined deficits of both partners' capital accounts and then multiplying the resulting ratio for each partner by the total amount of ordinary income to be allocated.

III.    *Conclusion*

CRC's special allocation of income of $307,759 to Newman PLLC and $255,799 to Town PS in 2013 did lack substantial economic effect (as the FPAA determined) because the partnership failed to maintain capital accounts in accordance with the requirement of Treasury Regulation section 1.704-1(b)(2)(iv) that CRC must allocate the unrealized gain inherent in the client-based intangibles across the partners' capital accounts before decreasing Newman PLLC's and Town PS's capital accounts by the value of the distribution. However, an analysis of the partners' interests in the partnership reveals that although Clark PLLC was the largest percentage owner of CRC's "membership units", the partners agreed to income allocations in their partnership agreement (including a QIO) that are most indicative of how they agreed to share the economic benefits and burdens of the partnership, particularly in light of the unanticipated distribution of client-based intangibles to Newman PLLC and Town PS.

Therefore, the IRS's determinations in the FPAA disregarding CRC's "client distributions" and reallocating CRC's allocations of ordinary income in the 2013 taxable year are hereby rejected and shall

**[\*56]** be redetermined in accordance with this Opinion. To give effect to the foregoing and the parties' concessions,

*Decision will be entered under Rule 155.*